# SUPREME COURT OF THE UNITED STATES

PATRICK HENRY MURPHY *v.* BRYAN COLLIER,
EXECUTIVE DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, ET AL.

ON APPLICATION FOR STAY

No. 18A985.   Decided March 28, 2019

The application for a stay of execution of sentence of death presented to JUSTICE ALITO and by him referred to the Court is granted. The State may not carry out Murphy's execution pending the timely filing and disposition of a petition for a writ of certiorari unless the State permits Murphy's Buddhist spiritual advisor or another Buddhist reverend of the State's choosing to accompany Murphy in the execution chamber during the execution.

JUSTICE THOMAS and JUSTICE GORSUCH would deny the application for a stay of execution.

JUSTICE KAVANAUGH, concurring in grant of application for stay.

As this Court has repeatedly held, governmental discrimination against religion—in particular, discrimination against religious persons, religious organizations, and religious speech—violates the Constitution. The government may not discriminate against religion generally or against particular religious denominations. See *Morris County Bd. of Chosen Freeholders* v. *Freedom from Religion Foundation*, 586 U. S. ___, ___ (2019) (statement of KAVANAUGH, J., respecting denial of certiorari) (slip op., at 2); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___–___ (2017) (slip op., at 13–14); *Larson* v. *Valente*, 456 U. S. 228, 244 (1982). In this case, the relevant Texas policy allows a Christian or Muslim inmate to have a state-employed Christian or Muslim religious adviser present either in the execution room *or* in the

adjacent viewing room.   But inmates of other religious
denominations—for example, Buddhist inmates such as
Murphy—who want their religious adviser to be present
can have the religious adviser present *only* in the viewing
room and *not* in the execution room itself for their execu-
tions.  In my view, the Constitution prohibits such denom-
inational discrimination.

   In an equal-treatment case of this kind, the government
ordinarily has its choice of remedy, so long as the remedy
ensures equal treatment going forward.   See *Stanton* v.
*Stanton*, 421 U. S. 7, 17–18 (1975).  For this kind of claim,
there would be at least two possible equal-treatment
remedies available to the State going forward: (1) allow all
inmates to have a religious adviser of their religion in the
execution room; or (2) allow inmates to have a religious
adviser, including any state-employed chaplain, only in
the viewing room, not the execution room.  A State may
choose a remedy in which it would allow religious advisers
only into the viewing room and not the execution room
because there are operational and security issues associat-
ed with an execution by lethal injection.  Things can go
wrong and sometimes do go wrong in executions, as they
can go wrong and sometimes do go wrong in medical pro-
cedures.  States therefore have a strong interest in tightly
controlling access to an execution room in order to ensure
that the execution occurs without any complications,
distractions, or disruptions.  The solution to that concern
would be to allow religious advisers only into the viewing
room.

   In any event, the choice of remedy going forward is up to
the State.  What the State may not do, in my view, is allow
Christian or Muslim inmates but not Buddhist inmates to
have a religious adviser of their religion in the execution
room.*

——————

   ∗Under all the circumstances of this case, I conclude that Murphy

made his request to the State in a sufficiently timely manner, one
month before the scheduled execution.

# SUPREME COURT OF THE UNITED STATES

PATRICK HENRY MURPHY *v.* BRYAN COLLIER,
EXECUTIVE DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, ET AL.

ON APPLICATION FOR STAY

No. 18A985.   Decided May 13, 2019

Statement of JUSTICE KAVANAUGH, with whom THE
CHIEF JUSTICE joins, respecting grant of application for
stay.

In light of JUSTICE ALITO's opinion dissenting from the
Court's March 28 order, I write to respectfully add two
points.

1. On March 28, the Court stayed Murphy's execution.
Murphy is Buddhist and wanted a Buddhist minister in
the execution room.   Under Texas' policy at the time,
inmates who were Christian or Muslim could have minis-
ters of their religions in the execution room.   But inmates
such as Murphy who were of other religions could have
ministers of their religions only in the adjacent viewing
room and not in the execution room.   That discriminatory
state policy violated the Constitution's guarantee of reli-
gious equality.

On April 2, five days after the Court granted a stay,
Texas changed its unconstitutional policy, and it did so
effective immediately.   Texas now allows all religious
ministers only in the viewing room and not in the execu-
tion room.   The new policy solves the equal-treatment
constitutional issue.   And because States have a compel-
ling interest in controlling access to the execution room, as
detailed in the affidavit of the director of the Texas Cor-
rectional Institutions Division and as indicated in the
prior concurring opinion in this case, the new Texas policy
likely passes muster under the Religious Land Use and

Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U. S. C. §2000cc *et seq.*, and the Free Exercise Clause.

Put simply, this Court's stay facilitated the prompt resolution of a significant religious equality problem with the State's execution protocol and should alleviate any future litigation delays or disruptions that otherwise might have occurred as a result of the State's prior discriminatory policy.

2. I greatly respect JUSTICE ALITO's position that the Court nonetheless should have denied Murphy's stay application as untimely, although I ultimately disagree. In saying that the Court should have denied a stay in this case, JUSTICE ALITO points in part to the execution earlier this year of Domineque Ray in Alabama, where this Court did not approve a stay. But several significant differences between the two cases demonstrate why a stay was warranted in Murphy's case but not in Ray's case.

*First*, unlike Murphy, Ray did not raise an equal-treatment claim. Ray raised an Establishment Clause claim to have the State's Christian chaplain removed from the execution room. The State of Alabama then agreed to remove the Christian chaplain, thereby mooting that claim. Notably, in the District Court, Ray expressly agreed that his Establishment Clause claim would be moot if the State removed the Christian chaplain from the execution room, as the State subsequently agreed to do. Ray also raised a RLUIPA claim to have his Muslim religious minister in the execution room and not just in the viewing room. As noted above, however, the State has a compelling interest in controlling access to the execution room, which means that an inmate likely cannot prevail on a RLUIPA or free exercise claim to have a religious minister in the execution room, as opposed to the viewing room.

To be sure, in granting Ray a stay, the Eleventh Circuit

relied on an equal-treatment theory, on the idea that the State's policy discriminated against non-Christian inmates. But Ray did not raise an equal-treatment argument in the District Court or the Eleventh Circuit. The Eleventh Circuit came up with the equal-treatment argument on its own, as the State correctly pointed out when the case later came to this Court. Amended Emergency Motion and Application to Vacate Stay of Execution in *Dunn* v. *Ray*, O. T. 2018, No. 18A815, pp. 10–11, 17. Given that Ray did not raise an equal-treatment argument, the Eleventh Circuit's stay of Ray's execution on that basis was incorrect.

For present purposes, the bottom line is that Ray did not raise an equal-treatment claim. Murphy did.

*Second*, in response to the Eleventh Circuit's stay in Ray's case, Alabama indicated to this Court that an equal-treatment problem, if there were one, would typically be remedied by removing ministers of all religions from the execution room (as Texas has now done). *Id.*, at 17. That remedy would of course have done nothing for Ray, who wanted his religious minister *in the execution room*. That presumably explains why Ray raised a RLUIPA claim, but did not raise an equal-treatment claim. And that further explains why it was incorrect for the Eleventh Circuit to stay Ray's execution on the basis of an argument (the equal-treatment theory) that was not raised by Ray and that, even if successful, would not have afforded Ray the relief he sought of having his religious minister in the execution room.

*Third*, unlike Ray, Murphy made his request to the State of Texas a full month before his scheduled execution. Yet the State never responded to Murphy's request to have any Buddhist minister in the execution room. The timing of Murphy's request, when combined with the State's foot-dragging in response and the ease with which the State could have promptly responded and addressed this dis-

crete issue, was relevant to the assessment of the equities for purposes of the stay. See *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006). As we have now seen, moreover, it took Texas only five days to change its discriminatory policy after a stay was granted. Texas' prompt response in the wake of the stay further underscores that Murphy's request was made in plenty of time for Texas to fix its discriminatory policy before Murphy's scheduled execution. Moreover, unlike Alabama in Ray's case, Texas did not indicate to this Court whether it would remedy any unconstitutional discrimination by allowing all ministers into the execution room or by keeping all ministers out. (After this Court granted the stay, the State of Texas chose the latter option.)

\* \* \*

In sum, this Court's stay in Murphy's case was appropriate, and the stay facilitated a prompt fix to the religious equality problem in Texas' execution protocol. That said, both the facts and the religious equality claim in Murphy's case were highly unusual. I fully agree with JUSTICE ALITO that counsel for inmates facing execution would be well advised to raise any potentially meritorious claims in a timely manner, as this Court has repeatedly emphasized. See generally *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*).

# SUPREME COURT OF THE UNITED STATES

PATRICK HENRY MURPHY *v.* BRYAN COLLIER,
EXECUTIVE DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, ET AL.

ON APPLICATION FOR STAY

No. 18A985.   Decided May 13, 2019

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting from grant of application for stay.

Patrick H. Murphy, who was convicted and sentenced to death in 2003, was scheduled to be executed at 7 p.m. on March 28.  Murphy's attorneys waited until March 26 before filing this suit in Federal District Court.  The complaint they filed challenges a feature of the Texas execution protocol that has been in place and on the public record since 2012.  The complaint claims that the Texas protocol violates the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U. S. C. §2000cc *et seq.,* insofar as it permits only a prison chaplain and not any outside cleric to be present in the room where executions are carried out.  Murphy is a Buddhist, and none of the more than 100 Texas prison chaplains is a Buddhist priest.

In carefully reasoned opinions based squarely on precedents of this Court, both the District Court and the Court of Appeals rejected Murphy's request for a stay of execution due to his dilatory litigation tactics, see 919 F. 3d 913, 916 (CA5 2019); 2019 WL 1369001, *1 (SD Tex., Mar. 26, 2019).  Then, on the afternoon of March 28, only hours before his execution was scheduled to occur, Murphy asked this Court to block his execution.  And despite his inexcusable delay in raising his claims, the Court granted Murphy's request.

I did not agree with the decision of the Court when it was made. Because inexcusably late stay applications present a recurring and important problem and because religious liberty claims like Murphy's may come before the Court in future cases, I write now to explain why, in my judgment, the Court's decision in this case was seriously wrong.

I

In 2000, while serving a 55-year sentence for aggravated sexual assault, Murphy and six other inmates executed a well-planned, coordinated, and violent escape from a Texas prison. About two weeks later, on Christmas Eve, the group robbed a sporting goods store and killed Irving, Texas, police officer Aubrey Hawkins when he arrived at the scene. The escapees shot Hawkins 11 times, dragged him from his vehicle, drove over him, and dragged his body for some distance. Six of the seven were eventually captured, convicted of capital murder, and sentenced to death. See *Murphy* v. *Davis*, 737 Fed. Appx. 693, 696–697 (CA5 2018); *Murphy* v. *State*, 2006 WL 1096924, *1, *4 (Tex. Crim. App., Apr. 26, 2006). Murphy was convicted and sentenced in 2003, and his direct appeal ended in 2007. *Murphy* v. *Texas*, 549 U. S. 1119 (2007). During the next 11 years, he unsuccessfully pursued postconviction relief in state and federal court. See *Murphy* v. *Davis*, 737 Fed. Appx., at 695, 699, 709. In November 2018, the State obtained a death warrant setting Murphy's execution for March 28, 2019.

By this time, Murphy had become a Pure Land Buddhist. According to his papers, he converted nearly a decade ago and has been visited by a Buddhist priest, Rev. Hui-Yong Shih, for the past six years.[1] In 2012, Texas made publicly available its policy regarding the presence

_____

[1] See Pet. for Prohibition in *In re Murphy*, No. 18–8615, pp. 12–13.

of a member of the clergy in the room where an execution by lethal injection is carried out. Under that policy, any of the prison system's chaplains, but no other cleric, may enter this room. Texas has more than 100 chaplains, who are either employees of or under contract with the prison system. These chaplains include Christians, Muslims, Jews, and practitioners of a Native American religion, but no Buddhist priest. The inadequate record compiled in this case does not explain the reason for this omission. It does not tell us how many Texas prisoners are Buddhists, whether any Texas prisoners ever requested a Buddhist chaplain, whether Texas made any effort to recruit such a chaplain, or whether any Buddhist priest is willing to do whatever is needed to serve as a chaplain. Nor do we know anything about the vetting of potential chaplains, any general training that chaplains receive, and any special orientation provided to a chaplain who accompanies a prisoner during the process of execution. And we also do not know what a chaplain is permitted to do during an execution or whether there are specific restrictions on movements or sounds that might interfere with the work of those carrying out an execution.

On February 28, 2019, about three months after Murphy's execution date was set, his attorneys wrote to the general counsel of the Texas Department of Criminal Justice and inquired whether Rev. Shih would be permitted to enter the execution room with their client, and on March 5, the department responded that only a chaplain is permitted in the room. Two days later, Murphy's attorney responded and said that he believed Murphy would be satisfied with a Buddhist chaplain but that he assumed none of Texas's chaplains were Buddhists. Texas did not respond and Murphy's attorneys never renewed their inquiry.

After receiving Texas's response, Murphy's attorneys waited 15 days—until March 20—before challenging this

decision in state court. The state court rejected the claim as untimely late in the evening of March 25, see *In re Murphy*, No. WR–63,549–02 (Tex. Crim. App., Mar. 26, 2019), p. 3, and on March 26, Murphy's lawyers filed this lawsuit in federal court. They asked the District Court to grant a stay of execution, but the District Court refused, citing the well-established rule that a stay of execution is an equitable remedy that should not be granted to an applicant who engages in inexcusably dilatory litigation tactics. 2019 WL 1369001, *1, *5. On March 27, the Court of Appeals for the Fifth Circuit likewise refused to grant a stay, holding that the District Court had not abused its discretion in denying that relief. See 919 F. 3d, at 916.

On March 28, at about 1 p.m.—six hours before the scheduled time of Murphy's execution—his attorneys brought his religious liberty claims to this Court. They filed, among other things, an application for a stay of execution pending the filing of a petition for a writ of certiorari.[2] At about 4 p.m., Texas filed a response, and shortly after 9 p.m., more than two hours after the time scheduled for Murphy's execution, the Court issued an order staying Murphy's execution unless the State allowed Rev. Shih "or a Buddhist reverend of the State's choosing" to accompany Murphy during the execution. *Ante*, p. ___. Murphy's death warrant was set to expire at midnight on March 28, and Texas announced that Murphy's execution would not proceed. Under Texas law, a new death warrant may be issued, but such a warrant may not set a date less than 90 days in the future. Tex. Code Crim. Proc. Ann., Art. 43.141(c) (Vernon 2018).

——————

[2] They also filed a petition for a writ of prohibition and an application for a stay pending the consideration of that petition.

## II

"[A] stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006). An applicant for a stay of execution must satisfy all the traditional stay factors and therefore must show that there is "a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari," that there is "a fair prospect that a majority of the Court will vote to reverse the judgment below," and, in a close case, that the equities favor the granting of relief. *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).

A court must also apply "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson* v. *Campbell*, 541 U. S. 637, 650 (2004); see also *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*) (noting that the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process may be grounds for denial of a stay).

Thus, in granting a stay in this case, the Court must have concluded that there is a reasonable probability that we will grant review of the question whether the District Court abused its discretion in finding that Murphy's delay in raising his religious liberty claims disentitled him to the equitable remedy of a stay. We do not generally grant review of such factbound questions. See this Court's Rule 10. But in death penalty matters, it appears, ordinary procedural rules do not apply, see *Madison* v. *Alabama*, 586 U. S. \_\_\_, \_\_\_ (2019) (ALITO, J., dissenting) (slip op., at 2). And in light of the dissent in *Dunn* v. *Ray*, 586 U. S. \_\_\_ (2019)—about which I will say more later—I do not

contest the Court's prediction about the probability of certiorari (as opposed to its propriety).

The likelihood of review, however, is not enough to justify a stay, so the Court's decision must also mean that, in its view, there is a significant likelihood that Murphy will succeed in showing that the District Court abused its discretion. And that I do contest. It is established that "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief," *Gomez*, *supra*, at 654, and the District Court's decision—and the Fifth Circuit's affirmance—cannot reasonably be thought to represent anything other than the careful and measured consideration of that matter. It is particularly remarkable to conclude that the District Court abused its discretion by ruling exactly as we had less than two months earlier. Compare 2019 WL 1369001, \*3 (relying on *Gomez* to deny untimely stay application), with *Dunn* v. *Ray*, *supra*, at ___ (same).

By granting a stay in this case, the Court disregards the "strong equitable presumption" against the grant of such relief when the applicant unreasonably delayed in raising the underlying claims. This presumption deserves greater respect because it serves many important interests.

First, it honors a State's strong interest in the timely enforcement of valid judgments of its courts. See *In re Blodgett*, 502 U. S. 236, 239 (1992) (*per curiam*). In this case, direct review of the judgment ended more than a decade ago. Moreover, if a State is pressured to modify a rule adopted for security reasons, the State has a legitimate claim to be given sufficient time to consider whether acceptable modifications are possible.

Second, eleventh-hour stay requests can impair valid interests of the federal courts. When courts do not have adequate time to consider a claim, the decisionmaking process may be compromised. And last-minute applications may disrupt other important work.

Third, the hasty decisionmaking resulting from late applications may harm the interests of applicants with potentially meritorious claims. Attorneys do not serve such clients well by unduly delaying the filing of claims that hold a real prospect of relief.

Finally, the cancellation of a scheduled execution only hours before (or even after) it is scheduled to take place may inflict further emotional trauma on the family and friends of the murder victim and the affected community.

In the present case, Murphy cannot overcome the presumption against last-minute applications. As I will explain, see Part III, *infra*, his religious liberty claims are dependent on the resolution of fact-intensive questions that simply cannot be decided without adequate proceedings and findings at the trial level. Those questions cannot be properly resolved in a matter of hours on a woefully deficient record. But that is precisely what Murphy asked of the lower courts and this Court.

As of at least 2013, Murphy and his attorneys knew or had reason to know everything necessary to assert the claim that the First Amendment and RLUIPA entitled him to have Rev. Shih at his side during his execution. By that date, Murphy had converted to Pure Land Buddhism, had begun to see Rev. Shih, and should have been aware of the Texas policy now at issue. Had Murphy begun to pursue his claims at that time, they could have been properly adjudicated long ago.

Even if Murphy is not held responsible for failing to act in 2013 or shortly thereafter, he and his attorneys certainly should have been spurred to action when, in November of last year, his execution date was set. Instead, his lawyers waited three months before writing to the Texas Department of Criminal Justice. How can that be justified?

Then, after receiving word on March 5 that Texas would adhere to its long-established policy, the attorneys waited three more weeks before filing suit. While they blame

Texas's failure to respond to their second e-mail for their delay, that is simply untenable. If they could not act without further communication from Texas, why did they fail to follow up with the State? Why did the attorneys decide they could file on March 20 in state court without further response from Texas but not before? What justified that delay? And why didn't the attorneys file in federal court at the same time?

By the time they got around to filing in federal court, it was March 26, two days before the scheduled execution date. And by the time they filed in this Court, the scheduled execution time and the time when the death warrant would expire were only hours away. If the tactics of Murphy's attorneys in this case are not inexcusably dilatory, it is hard to know what the concept means.

This Court receives an application to stay virtually every execution; these applications are almost all filed on or shortly before the scheduled execution date; and in the great majority of cases, no good reason for the late filing is apparent. By countenancing the dilatory litigation in this case, the Court, I fear, will encourage this damaging practice.[3]

———————

[3] In my judgment, the tactics in this case are just as unjustified as those that led the Court to vacate a stay of execution a few weeks ago in *Dunn* v. *Ray*, 586 U. S. ___ (2019). In that case, Ray, a Muslim, objected to Alabama's refusal to allow an imam to be present in the execution room. Ray filed suit in Federal District Court 10 days before his execution date. The District Court refused to issue a stay of execution, holding, among other things, that the application was untimely, *Ray* v. *Dunn*, 2019 WL 418105, \*1 (MD Ala., Feb. 1, 2019), but on February 6, the Eleventh Circuit granted a stay on the ground that Alabama's policy of allowing only its official chaplain, a Christian minister, to enter the execution room likely violated the Establishment Clause. *Ray* v. *Commissioner, Ala. Dept. of Corrections*, 915 F. 3d 689, 695–701, 703 (2019). The State asked us to vacate this stay, and we did so based on Ray's delay in raising his religious liberty claims. See *Ray,* 586 U. S., at ___. In both *Ray* and this case, the Court was presented at the last minute with claims that raised complicated issues that cannot be

### III

While I strongly disagree with the decision to grant a stay in this case, I recognize that Murphy, like Ray, raises serious questions under both the First Amendment and RLUIPA. Murphy argues, among other things, that Texas's policy of admitting only authorized chaplains illegally discriminates on the basis of religion. That is the argument embraced by both the concurrence in this case and the dissent in *Ray*. Both of those opinions seem to see this religious discrimination claim as one that is easily resolved under our Establishment Clause precedents, but that is simply not so.

Both opinions invoke precedents involving the constitutional rights of persons who are not incarcerated, see *Ray*, 586 U. S., at \_\_\_ (slip op., at 2); *ante,* at 1, and there is no question that, if Murphy were not in prison, Texas could not tell him that the only cleric he could have at his side in the moments before death is one who is approved by the State. But this Court's precedents hold that imprisonment necessarily imposes limitations on a prisoner's constitutional rights. See *Turner* v. *Safley*, 482 U. S. 78, 90 (1987); *O'Lone* v. *Estate of Shabazz*, 482 U. S. 342, 348–350 (1987). Under those cases, it is not enough for a prisoner to assert a claim that would succeed in the outside world. Instead, we must consider the following four factors: (1) whether a prison rule bears a "valid, rational connection to a legitimate governmental interest"; (2) "whether alternative means are open to inmates to exercise the asserted right"; (3) "what impact an accommodation of the right would have on guards, inmates, and prison resources"; and (4) "whether there are ready alternatives to the regulation." *Overton* v. *Bazzetta*, 539 U. S. 126, 132 (2003) (quoting *Turner, supra*, at 89–91; internal quotation marks omitted). Neither the *Ray* dissent nor

———————

adequately decided with hasty briefing and an inadequate record.

the concurrence in this case even mentions these precedents. Indeed, the *Ray* dissent is based on strict scrutiny, 586 U. S., at ___ (slip op., at 2), even though *Turner* specifically and emphatically rejected the use of that test in prisoner cases, 482 U. S., at 89.

On the flimsy record now before us, I would not presume to apply the *Turner* factors to Murphy's First Amendment claims, but there can be no doubt that *Turner* presents a serious obstacle. Here, Texas argues that it must be able to regulate the members of the clergy who are allowed in the execution room in order to ensure that these individuals do not intentionally or unintentionally engage in any conduct that might interfere with an execution. Murphy responds that Texas has failed to show that this is a real concern in his case because Rev. Shih has visited him in prison without incident and because Texas had sufficient time to do whatever additional vetting and training it thinks is needed. But on the present record, we cannot tell whether this is true. Visiting a living prisoner is not the same as watching from a short distance and chanting while a lethal injection is administered. And Texas may have an interest that goes beyond interference with Murphy's execution, namely, that allowing members of the clergy and spiritual advisers other than official chaplains to enter the execution room would set an unworkable precedent.

Specifically, Texas may be concerned that if it admits any cleric other than an official chaplain, every prisoner will insist on the presence of whichever outside cleric he prefers. Although the Court's order in this case permitted Texas to proceed with Murphy's execution if *any* Buddhist priest was allowed in the execution room, such a limited accommodation would not be acceptable in the outside world. There, Texas surely could not successfully defend a policy of admitting to the side of a dying patient only a state-approved cleric. Texas could not force a dying Bap-

tist to settle for a Catholic priest; it could not tell an Orthodox Jew that only a Reform rabbi would be allowed at his side; it could not force a Shi'ite to accept a Sunni imam; and so forth. I am aware of no single authoritative tally of the number of religions and denominations that exist in the United States, but the number is certainly very large. And of course, even within a particular religion or denomination, all clerics are not fungible. Moreover, I assume that, in the world outside prison walls, a State could not discriminate between clerics and any other person whose presence a dying patient might want at his side for spiritual or emotional support.

In permitting Murphy's execution to go forward provided that *some* Buddhist priest was allowed in the execution room, the Court may perhaps be understood to have concluded that a prison need not afford a prisoner facing execution the same array of choices that he would enjoy in the outside world. But if that is the Court's reasoning, what it shows is that the prison setting justifies important adjustments in the rules that apply outside prison walls. Determining just how far those adjustments may go is a sensitive question requiring an understanding of many factual questions that cannot be adequately decided on the thin record before us.[4]

---

[4] I have discussed the constitutional claim set out in the concurrence in this case and in the *Ray* dissent, namely, an Establishment Clause claim based on discrimination among religions. But Murphy also asserts Free Exercise Clause and RLUIPA claims, which, as he frames them, do not depend on disparate treatment of different religions or denominations. If States respond to the decision on Murphy's stay application by banning all clerics from the execution room, that may obviate any conflict with the Establishment Clause, but a prisoner might still press free exercise claims. A claim under the Free Exercise Clause of the First Amendment would have to contend with both *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), and *Turner*. Under RLUIPA, such a claim would present issues similar to those discussed below. See *infra*, at 12–13.

So far, I have discussed the prospects of Murphy's Establishment Clause claim, but even if that claim cannot succeed, he might still prevail under RLUIPA, which was enacted by Congress to provide greater protection for religious liberty than do this Court's First Amendment precedents. To prevail under RLUIPA, Murphy would have to show at the outset that excluding Rev. Shih would impose a substantial burden on his exercise of religion. See 42 U. S. C. §2000cc–1(a).

We have not addressed whether, under RLUIPA or its cousin, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.*, which contains an identical threshold requirement, §2000bb–1(b), there is a difference between a State's interference with a religious practice that is compelled and a religious practice that is merely preferred. In past cases, we have assessed regulations that compel an activity that a practitioner's faith prohibits. See, *e.g., Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 725–726 (2014); *Holt* v. *Hobbs*, 574 U. S. 352 (2015). And, while some Members of this Court have been reluctant to find that even a law compelling individuals to engage in conduct *condemned by their faith* imposes a substantial burden, see *Hobby Lobby*, 573 U. S., at 758–760 (GINSBURG, J., joined by BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (arguing that it is not a substantial burden to require Christian-owned businesses to facilitate the acquisition of abortifacients), a majority of this Court has held that it is not for us to determine the *religious* importance or rationality of the affected belief or practice. See *id.,* at 723–726. Similarly, it may be that RLUIPA and RFRA do not allow a court to undertake for itself the determination of which religious practices are sufficiently mandatory or central to warrant protection, as both protect "any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief." §2000cc–5(7)(A) (emphasis added).

But this does not answer what results when the State offers a prisoner an alternative practice that, in terms of religious significance, is indistinguishable from the prohibited practice. Persons of many faiths may *desire* the support of a cleric in the moments before death, but not every religion would draw a distinction between a meeting with a clergyman shortly before death and one precisely at the moment of death. Murphy's situation, however, may be different because he believes that he will be reborn in the Pure Land only if he succeeds in remaining focused on Buddha while dying and that the chants of a Buddhist priest will help him in this endeavor. See Pet. for Prohibition in *In re Murphy*, No. 18–8615, pp. 12–17.

I will assume for present purposes that a policy like Texas's imposes a substantial burden on *any* prisoner who seeks the presence of a cleric other than one of the official chaplains, but that does not necessarily mean that the prisoner's RLUIPA claim would prevail. The State claims that its policy furthers its compelling interest in security and that the policy is narrowly tailored to serve that interest, see Brief in Opposition 20–23, 29, and in deciding whether its policy can be sustained on that basis, we would face unresolved factual questions that are similar to those discussed above. The RLUIPA standard, §2000cc–1(a)(2), to be sure, would be more favorable to the prisoner, but the nature of the underlying issues would be similar.

IV

The claims raised by Murphy and Ray are important and may ultimately be held to have merit. But they are not simple, and they require a careful consideration of the legitimate interests of both prisoners and prisons. See *Holt* v. *Hobbs, supra.* Prisoners should bring such claims well before their scheduled executions so that the courts can adjudicate them in the way that the claims require

and deserve and so that States are afforded sufficient time to make any necessary modifications to their execution protocols.

In this case, however, Murphy egregiously delayed in raising his claims. By countenancing such tactics, the Court invites abuse.

For these reasons, Murphy's stay application, like Ray's, should have been denied.