IN THE UNITED STATES DISTRICT COURT 
 FOR THE MIDDLE DISTRICT OF ALABAMA 
 NORTHERN DIVISION 

WILLIE B. SMITH, III, ) 
 ) 
 Plaintiff, ) 
 ) 
 v. ) 
 ) CASE NO. 2:20-CV-1026-RAH 
JEFFERSON DUNN, Commissioner, ) [WO] 
Alabama Department of Corrections, ) 
 ) 
 ) 
 Defendant. ) 

 MEMORANDUM OPINION AND ORDER 
 I. INTRODUCTION 

 On December 14, 2020, Willie B. Smith, III (“Smith”), a death-row inmate 
housed at Holman Correctional Facility,1 filed a complaint, pursuant to 42 U.S.C. § 
1983, alleging that the Alabama Department of Corrections (“ADOC”) will violate 
Smith’s right to exercise his religious beliefs by prohibiting the presence of his 
personal spiritual advisor, a Christian minister, inside the execution chamber during 
his execution, presently scheduled for February 11, 2021. Smith claims that the 
ADOC’s blanket policy of prohibiting the presence of all persons who are not 
members of the prison’s execution team, including spiritual advisors, from inside 

1 Holman is the ADOC’s primary correctional facility for housing death row inmates and is the 
only facility in the state of Alabama that carries out executions. 
the execution chamber abridges his federal statutory rights under the Religious Land 
Use and Institutionalized Persons Act of 2000 (“RLUIPA”), 42 U.S.C. § 2000cc et 

seq., his state constitutional rights under the Alabama Religious Freedom 
Amendment (“ARFA”), Ala. Const. Art I, § 3.01, and his constitutional rights under 
the Establishment and Free Exercise Clauses of the First Amendment to the United 

States Constitution.2 
 Smith seeks declaratory and injunctive relief against Defendant Jefferson 
Dunn, in his official capacity as the ADOC’s Commissioner. 
 On December 14, 2020, Smith filed an Emergency Motion for Preliminary 

Injunction (Doc. 4), requesting that the ADOC be ordered to allow his personal 
spiritual advisor, Pastor Robert Wiley, Jr., to not only be physically present inside 
the execution chamber during Smith’s execution, but to pray with Smith, hold his 

hand, and otherwise touch Smith at the moment of his death. According to Smith, 
this practice “would provide Mr. Smith comfort, strengthen his resolve, and help 
him properly express to God his repentance for any wrongs he has committed.” 
(Doc. 1, p. 12.) 

2 Initially, Smith also raised claims concerning an ADOC policy that prohibited him from attending 
outdoor religious services every other Sunday with the general population inmates once Smith’s 
execution date was set. That concern is now moot, due to the ADOC’s agreement to allow Smith 
to listen to the Sunday services in the weeks preceding his scheduled execution. (See Doc. 12-1.) 
The policy stems from security concerns that arise when a condemned inmate is allowed to interact 
with the general population in the weeks preceding his scheduled execution. 
 The ADOC filed a response in opposition to Smith’s Emergency Motion for 
Preliminary Injunction. Within that response, the ADOC also moved to dismiss 

Smith’s complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim 
upon which relief may be granted. (Doc. 12.) Smith has replied to the ADOC’s 
response to his motion and has responded to the ADOC’s motion to dismiss. (Doc. 

13-1.) Following these filings, the court heard oral argument and allowed the parties 
to file supplementary evidentiary submissions on the preliminary injunction issue. 
Accordingly, this matter is ripe for review. For the reasons that follow, the ADOC’s 
motion to dismiss is due to be GRANTED in part and DENIED in part, and Smith’s 

motion for a preliminary injunction is due to be DENIED. 
 II. FACTUAL AND PROCEDURAL HISTORY 
A. Smith’s Capital Litigation History 

 Following a jury trial, Smith was convicted of the 1991 execution-style 
murder of Sharma Ruth Johnson during a robbery and kidnapping. See Smith v. State, 
838 So. 2d 413 (Ala. Crim. App. 2002). By a vote of 10-2, a jury recommended the 
death sentence.3 The trial court accepted the jury’s recommendation and sentenced 

Smith to death on July 17, 1992. 
 In 2002, the Alabama Court of Criminal Appeals affirmed Smith’s conviction 

3 The trial court’s sentencing order can be found at C. 148–67 in the trial transcript, available in 
Volume 1 of the habeas record filed in Smith v. Thomas, 2:13-cv-00557-RDP (N.D. Ala.). 
and death sentence. Id. at 477. The Alabama Supreme Court denied certiorari, see 
Ex parte Smith, No. 1011228 (Ala. June 28, 2002), as did the United States Supreme 

Court, see Smith v. Alabama, 537 U.S. 1090 (2002) (mem.). 
 Smith then proceeded with both state post-conviction and federal habeas 
proceedings. On July 2, 2020, the United States Supreme Court denied certiorari as 

to Smith’s habeas claims, thereby concluding Smith’s appeals. See Smith v. Dunn, 
No. 19-7745, 2020 WL 3578738 (July 2, 2020) (mem.). 
 On November 25, 2020, Smith filed his first § 1983 complaint in the Middle 
District of Alabama alleging both method-of-execution and Americans with 

Disabilities Act claims.4 After oral argument, that case was dismissed without 
prejudice.5 On the same day that Smith’s initial § 1983 suit was dismissed, Smith 
filed the present action. 

B. The ADOC’s Change to its Execution Protocol 
 Historically, Holman’s Christian chaplain—an ADOC employee—was a 
member of the prison’s execution team. (Doc. 27-6, p. 7.) Prior to April 2019, the 
ADOC’s execution protocol required the chaplain’s presence inside the execution 

4 On December 1, 2020, while Smith’s initial § 1983 case was ongoing, the Alabama Supreme 
Court issued a death warrant, scheduling Smith’s execution on February 11, 2021. 

5 Smith v. Dunn, Case No. 2:19-cv-927 (M.D. Ala. Dec. 14, 2020), Doc. 25. As of the date of this 
order, Smith has amended his complaint in this initial § 1983 case and the ADOC has filed a 
motion to dismiss, which remains pending. 
chamber during an execution. (Id.) In response to litigation in both Alabama and 
Texas,6 the ADOC amended its execution protocol in April 2019 to remove its 

Christian chaplain from the execution chamber. (Doc. 12, p. 12.) Therefore, under 
the amended protocol, a condemned inmate cannot have anyone in the execution 
chamber with him: not a spiritual advisor of his choosing, not the prison chaplain, 

not his legal counsel, nor any friend or family member such as a mother, father, 
spouse, or child. 
 But under the ADOC’s current protocol, a condemned inmate may have 
contact visits from a free-world spiritual advisor in the days and moments preceding 

his execution.7 On the day of his execution, the inmate’s spiritual advisor may 
remain with the inmate in his cell until the inmate is escorted to the execution 
chamber. His spiritual advisor may then witness the execution from the viewing 

room but is not permitted to enter inside the execution chamber. At the moment of 
execution, the spiritual advisor, along with other witnesses in the viewing room, can 
be situated less than 10 feet away from the inmate, but will be separated by two-way 
security glass. The ADOC’s policy applies to all religious personnel, regardless of 

affiliation or employer, including the prison chaplain.8 

6 See Doc. 12, p. 12; see also Doc. 27-9, pp. 25-27. 

7 ADOC EXECUTION PROCEDURES 6, 7. (Doc. 27-2, pp. 6-7.) 

8 Id., p. 8 (subsection IX.G.2). 
C. The Gutierrez Litigation 
 In 2019, death-sentenced inmate Ruben Gutierrez filed a similar lawsuit after 

the Texas Department of Criminal Justice (“TDCJ”) amended its execution protocols 
to remove its institutional chaplains from the execution chamber. Gutierrez alleged, 
inter alia, that the change in protocol violated RLUIPA and the First Amendment.9 

Gutierrez requested an accommodation allowing his chosen spiritual advisor to be 
permitted inside the execution chamber. In the alternative, Gutierrez asked that the 
TDCJ revert to its long-standing policy of allowing the institutional chaplain’s 
presence inside the chamber during his execution. The district court found that 

Gutierrez had shown a likelihood of success on the merits of either his execution-
chamber claims or the DNA-testing claims raised in the same litigation.10 The 
district court denied the TDCJ’s motion to dismiss and granted Gutierrez’s motion 

to stay his execution. 
 On appeal, the Fifth Circuit disagreed with the trial court, holding in part that 
Gutierrez failed to make a strong showing of success on the RLUIPA claim, noting 
that the TDCJ’s policy did not substantially burden Gutierrez’s ability to exercise 

his religion. Gutierrez v. Saenz, 818 F. App’x 309, 314-15 (5th Cir. 2020). Gutierrez 

9 Gutierrez v. Saenz, Case No. 19-cv-185 (S.D. Tex. 2019). 

10 Id., Doc. 48; Doc. 57, p. 3. 
then filed a petition for a writ of certiorari in the United States Supreme Court. 
 In June 2020, the Supreme Court granted a stay of execution and ordered the 

district court to develop a narrow factual issue: “whether serious security problems 
would result if a prisoner facing execution is permitted to choose the spiritual advisor 
the prisoner wishes to have in his immediate physical presence during the 

execution.” Gutierrez v. Saenz, 141 S. Ct. 127, 128 (2020) (mem). 
 In compliance with this order, the district court considered the evidence and 
briefs submitted by the parties and concluded that “no serious security problems 
would result” if death-sentenced inmates were permitted to have the spiritual 

advisors of their choosing to be present with them inside the execution chamber.11 
 Upon review of the trial court’s findings, the Supreme Court granted 
certiorari, vacated the Fifth Circuit’s order, and remanded the case to the Fifth 

Circuit with instructions to remand to the district court for “further and prompt 
consideration” of Gutierrez’s claims regarding the presence of a spiritual advisor 
inside the execution chamber. Gutierrez v. Saenz, No. 19-8695, 2021 WL 231538 
(Jan. 25, 2021) (mem). 

 III. JURISDICTION AND VENUE 
 The Court has original subject matter jurisdiction of this case pursuant to 28 
U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court 

11 Gutierrez v. Saenz, Case No. 19-cv-185 (S.D. Tex. 2019), Doc. 124, p. 2. 
concludes that venue properly lies in the Middle District of Alabama. See 28 U.S.C. 
§ 1391. 

 III. STANDARD OF REVIEW 
A. ADOC’s Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) 
 A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint 

against the legal standard set forth in Federal Rule of Civil Procedure 8: “a short and 
plain statement of the claim showing that the pleader is entitled to relief.” Fed. R. 
Civ. P. 8(a)(2). “To survive a motion to dismiss, a complaint must contain sufficient 
factual matter, accepted as true, to ‘state a claim to relief that is plausible on its 

face.’” Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. 
Twombly, 550 U.S. 544, 570 (2007)). 
 In ruling on a motion to dismiss for failure to state a claim on which relief can 

be granted, the court must accept well-pleaded facts as true, but the court is not 
required to accept a plaintiff’s legal conclusions. Iqbal, 556 U.S. at 678. A complaint 
may be dismissed if the facts as pled do not state a claim for relief that is plausible 
on its face. See id. at 679 (explaining “only a complaint that states a plausible claim 

for relief survives a motion to dismiss”). “Determining whether a complaint states 
a plausible claim for relief [is] . . . a context-specific task that requires the reviewing 
court to draw on its judicial experience and common sense.” Id. The plausibility 

standard requires “more than a sheer possibility that a defendant has acted 
unlawfully.” Id. at 678. 
 Factual allegations in a complaint need not be detailed but “must be enough 

to raise a right to relief above the speculative level . . . on the assumption that all the 
allegations in the complaint are true (even if doubtful in fact).” Twombly, 550 U.S. 
at 555 (internal citations omitted). Conclusory allegations that are merely 

“conceivable” and fail to rise “above the speculative level” are insufficient to meet 
the plausibility standard. Id. This pleading standard “does not require ‘detailed 
factual allegations,’ but it demands more than an unadorned, the-defendant-
unlawfully-harmed-me accusation.” Iqbal, 556 U.S. at 678. Indeed, “[a] pleading 

that offers ‘labels and conclusions’ or ‘a formulaic recitation of the elements of a 
cause of action will not do.’” Id. It is the plaintiff’s responsibility to allege sufficient 
facts to support his claims. See Twombly, 550 U.S. at 555. 

B. Smith’s Emergency Motion for Preliminary Injunction 
 A party seeking emergency injunctive relief must establish four elements: 
“(1) a substantial likelihood of success on the merits of the underlying case, (2) the 
movant will suffer irreparable harm in the absence of an injunction, (3) the harm 

suffered by the movant in the absence of an injunction would exceed the harm 
suffered by the opposing party if the injunction issued, and (4) an injunction would 
not disserve the public interest.” North Am. Med. Corp. v. Axiom Worldwide, Inc., 

522 F.3d 1211, 1217 (11th Cir. 2008) (quoting Johnson & Johnson Vision Care, Inc. 
v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246-47 (11th Cir. 2002)). 
 A preliminary injunction requires showing “imminent irreparable harm” and 

“a delay in seeking a preliminary injunction of even only a few months—though not 
necessarily fatal—militates against a finding of irreparable harm.” See Wreal, LLC 
v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016). 

 Courts apply a “sliding scale” by “considering the probability of plaintiffs’ 
winning on the merits and plaintiffs’ irreparable injury in the absence of 
interlocutory relief.” Siff v. State Democratic Executive Comm., 500 F.2d 1307, 1309 
(5th Cir. 1974); see also State of Texas v. Seatrain Intern., S.A., 518 F.2d 175, 180 

(5th Cir. 1975) (“[N]one of the four prerequisites has a fixed quantitative value. 
Rather, a sliding scale is utilized, which takes into account the intensity of each in a 
given calculus.”).12 

 In ruling on a preliminary injunction, the court may consider evidence, even 
hearsay evidence, submitted by the parties. See Levi Strauss & Co. v. Sunrise Intern. 
Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995). 
 IV. DISCUSSION 

 The ADOC contends that Smith’s RLUIPA and ARFA claims and his 

12 The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit issued 
prior to October 1, 1981, and all former Fifth Circuit Unit B and non-unit decisions rendered after 
October 1, 1981. See Stein v. Reynolds Secur., Inc., 667 F.2d 33, 34 (11th Cir. 1982); Bonner v. 
City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). 
constitutional claims asserting violations of the First Amendment’s Establishment 
and Free Exercises Clauses should be dismissed because Smith fails to state a claim 

for which relief can be granted. On the premise that Smith’s claims are subject to 
dismissal under Fed. R. Civ. P. 12(b)(6), the ADOC submits that Smith is not entitled 
to the preliminary injunctive relief he seeks. The court addresses each claim in turn. 

A. RLUIPA Claim 
 Smith claims that the ADOC will violate RLUIPA by denying his request for 
his spiritual advisor, a Christian minister, to be present inside the execution chamber 
during his execution. Smith believes that his pastor’s presence during his execution 

is “essential for his spiritual well-being” and will provide Smith comfort to “ease the 
transition between the worlds of the living and the dead.” (Doc. 1, pp. 2, 11.)13 Smith 
alleges that the ADOC’s refusal to allow his pastor’s presence in the execution 

chamber will substantially burden his religious exercise. (Id., p. 13.) 
 RLUIPA provides: 
 No government shall impose a substantial burden on the religious 
 exercise of a person residing in or confined to an institution . . . 
 even if the burden results from a rule of general applicability, 
 unless the government demonstrates that imposition of the 
 burden on that person — 

 (1) is in furtherance of a compelling governmental interest; and 
 (2) is the least restrictive means of furthering that compelling 

13 Citations to page numbers in documents filed in this case will be to the page number generated 
by the court’s CM/ECF system. 
 governmental interest. 

42 U.S.C. § 2000cc-1(a). 
 To establish a prima facie case under RUILPA, Smith bears the initial burden 
of showing “(1) that he engaged in a religious exercise, and (2) that the religious 
exercise was substantially burdened by a government practice.” Muhammad v. Sapp, 
388 F. App’x 892, 895 (11th Cir. 2010). If Smith establishes a prima facie case, the 

burden shifts to the ADOC to show that the challenged government practice is “in 
furtherance of a compelling governmental interest” and “is the least restrictive 
means of furthering that compelling governmental interest.” Id. Conversely, if 

Smith fails to present evidence to establish a prima facie case, the court need not 
inquire into whether the governmental interest at stake is compelling. See Smith v. 
Allen, 502 F.3d 1255, 1276 (11th Cir. 2007) (abrogated on other grounds); Midrash 

Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004). 
 Context matters in the application of the compelling governmental interest 
standard. Cutter v. Wilkinson, 544 U.S. 709, 723 (2005). The standard is applied 
with “due deference to the experience and expertise of prison and jail administrators 

in establishing necessary regulations and procedures to maintain good order, security 
and discipline, consistent with consideration of costs and limited resources.” Id. 
 1. Defendant ADOC’s Motion to Dismiss 

 The ADOC argues that Smith has failed to state a RLUIPA claim upon which 
relief may be granted because he has failed to plead facts showing that the ADOC 
will “substantially burden” the exercise of his religion. (Doc. 12, pp. 19-23.) Smith 

counters that he has adequately stated a facially plausible claim for relief by pleading 
facts that allege a substantial burden on his religious exercise. (Doc. 13-1, p. 26.) 
 As noted above, RLUIPA uses a burden-shifting framework. Smith bears the 

initial burden of establishing a prima facie violation of RLUIPA. To do so, Smith 
must allege that he will engage in a religious exercise and that his religious exercise 
will be substantially burdened by a government practice. 
 In his Complaint, Smith avers that he is a practicing Christian and that it is 

“integral to [his] faith that Pastor Wiley be physically present with him at the time 
of his execution.” (Doc. 1, p. 11.) Smith further contends that the ADOC’s refusal 
to allow Pastor Wiley’s presence in the execution chamber substantially burdens his 

religious practice by preventing Smith and his pastor from praying together and 
holding hands at the moment of his passing. (See id., pp. 10-13.) 
 Construing the facts in the Complaint in favor of Smith, as the court must do 
at this stage, and assuming the truthfulness of Smith’s statements that he is a 

practicing Christian and that his request for his pastor to be physically present with 
him in the execution chamber is an important aspect of his faith, Smith has 
sufficiently pled a RLUIPA violation. Smith has sufficiently alleged both that he 

wishes to engage in a religious practice and that the ADOC’s blanket policy of 
excluding spiritual advisors in the execution chamber will substantially burden his 
religious practice by preventing him from praying with and receiving comfort from 

his pastor in the final moments of his life. Because Smith’s allegations plead a claim 
that is plausible on its face, the ADOC’s motion to dismiss is due to be DENIED as 
to Smith’s RLUIPA claim. 

 2. Smith’s Emergency Motion for Preliminary Injunction 
 Smith argues that without this court’s intervention, the ADOC will execute 
Smith in violation of his “statutorily . . . protected religious solace” under RLUIPA. 
(Doc. 4, p. 7.) Smith points to his sincerely held religious beliefs, the ADOC’s 

policy of disallowing all spiritual advisors in the execution chamber, and recent 
Supreme Court decisions to support his position that he would be successful on the 
merits of his claims. (Doc. 4, pp. 9-10, 12-17.) The ADOC responds by arguing that 

Smith cannot meet the necessary elements for a preliminary injunction because 
Smith is not likely to succeed on the merits of his RLUIPA claim, will not suffer 
irreparable harm, and that the public’s interest weighs in favor of denying injunctive 
relief. (Doc. 12, pp. 41-44.) 

 a. Likelihood of Success on the Merits 
 As noted above, to succeed on the merits of his RLUIPA claim, Smith must 
show (1) that he will engage in a religious exercise, and (2) that his religious exercise 

will be substantially burdened. See Adkins v. Kaspar, 393 F.3d 559, 567 (5th Cir. 
2004); 42 U.S.C. § 2000cc–1(a). If Smith succeeds in demonstrating a prima facie 
case, the ADOC must then show that the challenged government action “is in 

furtherance of a compelling governmental interest” and “is the least restrictive 
means of furthering that compelling governmental interest.” 42 U.S.C. §§ 2000cc–
1(a), 2000cc–2(b). In contrast, if Smith fails to present evidence to support a prima 

facie case under RLUIPA, the court need not inquire into whether the governmental 
interest at stake is compelling. See Midrash, 366 F.3d at 1228. 
 i. Sincere Religious Practice 
 To succeed on his RLUIPA claim, Smith bears the initial burden of presenting 

evidence demonstrating that his observance of Christianity and his belief that his 
pastor’s physical presence will provide comfort during his execution constitute a 
“religious exercise” under the statute. See Adkins, 393 F.3d at 567. A “religious 

exercise” is broadly defined under RLUIPA as “any exercise of religion, whether or 
not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000cc–
5(7)(A). 
 Along with his motion, Smith submitted two declarations: one from Smith’s 

attorney on Smith’s behalf14 and a second from Pastor Wiley. Smith’s declaration 

14 Due to current COVID-19 safety protocols, the ADOC is not allowing in-person visitation at its 
penal facilities. As a result, Smith gave permission for his counsel to sign a sworn declaration on 
Smith’s behalf to avoid “delay in his ability to bring a timely action.” (See Doc. 4-1, p. 1.) 
Although attorney affidavits in this fashion are disfavored, under the current pandemic situation 
avers that Smith is a devout Christian and has a close, spiritual connection with 
Pastor Wiley. (Doc. 4-1, p. 2.) The declaration further states that Smith’s faith 

teaches that the point of transition between life and death is important and that Smith 
believes Pastor Wiley can provide spiritual comfort in his final moments. (Id.) 
 In his declaration, Pastor Wiley submits that in the Christian faith, Christians 

provide strength and comfort to one another, adding that there is “no greater time to 
need that comfort than when . . . facing loss of your own life.” (Doc. 4-2, p. 2.) Pastor 
Wiley further states that he shares Smith’s belief that his physical presence inside 
the execution chamber will provide comfort and solace to Smith. (Id.) 

 In light of RLUIPA’s all-encompassing definition of “religious exercise,” 
Smith’s declaration through his attorney, and Pastor Wiley’s statements, this court 
concludes that Smith's practice of Christianity and his belief that his pastor should 

be physically present with him in the execution chamber constitute a “religious 
exercise” for purposes of a RLUIPA claim. 
 ii. Substantial Burden 
 The Eleventh Circuit has previously defined a “substantial burden” as 

including “significant pressure which directly coerces the religious adherent to 
conform his or her behavior accordingly.” Midrash, 366 F.3d at 1227. Importantly, 

and in the absence of an objection by the ADOC, the court will overlook the admissibility issues 
associated with such a filing. 
the Circuit has made clear that, in order to constitute a “substantial burden” on 
religious practice, the government's action must be “more than . . . incidental” and 

“must place more than an inconvenience on religious exercise.” Id. (citation 
omitted). Therefore, to constitute a substantial burden under RLUIPA, the 
governmental action must considerably hamper one's religious exercise. 

 “While it is true that courts are not to inquire into the centrality of a particular 
religious tenet in undertaking the substantial burden analysis, . . . at a minimum the 
substantial burden test requires that a RLUIPA plaintiff demonstrate that the 
government's denial of a particular religious item or observance was more than an 

inconvenience to one's religious practice.” Allen, 502 F.3d at 1278; see also Lyng v. 
Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988) (indicating 
that, to constitute a substantial burden, the government action must do more than 

make it more difficult to practice one's religion, it should coerce individuals into 
acting contrary to their religious beliefs); Adkins, 393 F.3d at 569–70 (explaining 
that a substantial burden “pressures the adherent to significantly modify his religious 
behavior and significantly violate his religious beliefs”); San Jose Christian Coll. v. 

City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004) (defining substantial 
burden as an “oppressive” and “significantly great restriction or onus upon 
[religious] exercise”); Civil Liberties for Urban Believers v. City of Chicago, 342 

F.3d 752, 761 (7th Cir. 2003) (holding that a substantial burden “necessarily bears 
direct, primary, and fundamental responsibility for rendering religious exercise . . . 
effectively impracticable”). 

 Importantly, more is needed than the inmate's own statements to establish that 
one's religious practice is substantially burdened. Without evidence from outside, 
authoritative sources regarding the tenets and practices of a particular religion, a 

substantial burden may not be proven. Allen, 502 F.3d at 1277–80; see also Smith v. 
Governor for Alabama, 562 F. App'x 806, 813 (11th Cir. 2014); Gelford v. Frank, 
310 F. App'x 887, 889 (7th Cir. 2008) (affirming denial of an inmate’s claim for 
runes and other divination tools for the practice of Wicca on grounds that there was 

no formidable evidence of a substantial burden, only the inmate’s “unreasoned say-
so”) (citing Borzych v. Frank, 439 F.3d 388, 390 (7th Cir. 2006)). 
 The Eleventh Circuit case of Smith v. Allen provides guidance to this court's 

analysis of the instant case. The plaintiff in that case, also a prisoner, requested 
permission to possess a small quartz crystal for use in his practice of Odinism. After 
reviewing materials relevant to the principles of Odinism, the prison’s chaplain 
found no evidence of the need for a crystal in practicing the religion, and as a result, 

the use of the crystal was denied. Allen, 502 F.3d at 1277. The Eleventh Circuit 
agreed, holding that the plaintiff had presented “no evidence to demonstrate that a . 
. . crystal was fundamental” to his religious practice such that the denial “effectuated 

any more than an inconvenience on his religious exercise.” Id. at 1278. 
Consequently, the court held that the plaintiff had failed to establish a prima facie 
case that the practice of his religion was substantially burdened. Id. at 1279. 

 The Eleventh Circuit similarly denied the plaintiff's other claims regarding the 
denial of a designated area of worship and the denial of a small fire pit instead of the 
candle he was provided, noting the plaintiff failed to provide evidence from any 

outside sources to establish that either was necessary to the practice of his religion. 
Id. at 1279–80; see also Muhammad v. Sapp, 388 F. App'x 892, 896 (11th Cir. 2010) 
(finding no substantial burden with regard to Muslim inmate's not receiving a Qibla 
compass because no evidence was proffered to establish that the compass was 

fundamental to his practice of Islam); Adams v. Mosley, No. 2:05CV352-MHT, 2008 
WL 4369246, at *11 (M.D. Ala. Sept. 25, 2008) (same with regard to inmate seeking 
to use tobacco, instead of an herbal substitute, for use in the practice of his Native 

American religion); Avila v. McDonough, No. 3:05CV280/LAC/EMT, 2007 WL 
2480246, at *7 (N.D. Fla. Aug. 30, 2007) (finding no substantial burden with regard 
to inmate's request for specific beads in the practice of his Santerían faith when other 
types of beads were allowed to him); Krieger v. Brown, No. 5:08-CT-3090-FL, 2010 

WL 4026090, at *5 (E.D.N.C. Oct. 13, 2010) (same with regard to denial of an 
outdoor worship circle for an inmate's practice of Asatru). 
 In the instant case, Smith submitted two declarations as evidence in support 

of his motion for preliminary injunction. Both declarations describe Smith’s belief 
that Pastor Wiley’s presence in the execution chamber will provide comfort to Smith 
at the time of his execution. (See Docs. 4-1, 4-2.) After oral argument was heard in 

this case, this court gave the parties leave to file additional evidence in support of 
their respective positions. (See Docs. 20, 23.) While Smith did file additional 
evidence, his submissions were directed toward challenging the ADOC’s 

compelling interest in the security of its executions and whether its practice of 
prohibiting all persons, including spiritual advisors, inside the execution chamber 
was the least restrictive means of addressing those security concerns. (See generally 
Doc. 26.) Smith provided the court with no supplementary resources that speak to 

the potential burden the ADOC’s protocol would have on his religious practice. As 
a result, the court is left to solely rely on the two declarations to determine whether 
a substantial burden exists. 

 In his declaration, Smith contends that Pastor Wiley’s physical presence 
inside the execution chamber during his execution would “provide him spiritual 
comfort and help relieve his struggle as he passes, including by holding his hand, 
praying with him in his final moments, and easing the transition between the worlds 

of the living and the dead.” (Doc. 4-1, pp. 2-3.) Similarly, Pastor Wiley’s declaration 
highlights the need for Christian believers to comfort one another, particularly in 
difficult moments such as facing one’s own death. (Doc. 4-2, p. 2.) Pastor Wiley 

agrees that his presence in the execution chamber will give Smith “comfort and 
solace as he leaves the physical world and enters the afterlife.” (Id.) 
 While these declarations certainly speak to Smith’s beliefs as a practicing 

Christian and his desire for comfort and spiritual guidance during his execution, this 
evidence is not sufficient to prove a substantial burden on Smith’s religious 
practices. Smith has only expressed a preference for Pastor Wiley’s presence in the 

execution chamber; he has provided the court with no evidence that the ADOC’s 
policy substantially burdens his religious exercise or prevents him from participating 
in an integral component of his faith. 
 The case of Smith v. Allen is again instructive here. There, the plaintiff argued 

that the prison’s outright denial of his request for an accommodation in accordance 
with his sincerely held religious beliefs was enough, standing alone, to demonstrate 
a substantial burden on his religious exercise. Allen, 502 F.3d at 1277. The Eleventh 

Circuit decidedly rejected this argument: 
 Such an expansive reading of section 3, however, would 
 require us to find a substantial burden whenever any request in 
 connection with a sincere religious belief was denied by a state 
 prison. If the word “substantial” in the statutory phrase 
 “substantial burden,” 42 U.S.C. § 2000cc–1(a), is to retain any 
 meaning, it must, at a minimum, be construed as requiring 
 something more than solely the denial of a request that is sincere. 
 An alternate approach, like the one advocated by Smith, would 
 result in the word “substantial” in § 2000cc–1(a) as being mere 
 surplusage, since every governmental action denying a requested 
 item to be used in religious observance would give rise to a prima 
 facie RLUIPA claim. We decline to adopt such an expansive 
 reading of section 3 of RLUIPA. 
Id. at 1278. 
 Similarly, Smith, the plaintiff here, has provided the court with evidence of 

his sincere belief and of the ADOC’s refusal to allow his pastor’s presence inside 
the execution chamber. But this alone is simply insufficient to demonstrate that the 
ADOC’s policy is more than an incidental burden on Smith’s religious exercise. 

Smith is still free to fully engage in the practices of his faith. Crucially, the ADOC’s 
policy allows Smith to have in-person contact visits with his pastor in the days and 
moments leading up to his execution. (Doc. 27-6.) The two may pray together, touch 
one another, and study spiritual text together. In fact, on the day of his execution, 

Pastor Wiley will be permitted to visit with Smith and remain with him in his cell. 
(Id.) The two will be separated only when it is time for Smith to enter the execution 
chamber, a matter of only minutes before the actual execution proceeds. (Id.) Then, 

at the moment of execution, the ADOC’s policy allows Pastor Wiley to observe the 
execution from the viewing room, mere feet away from Smith and separated only by 
a pane of glass, in full view of each other.15 
 Smith has provided no evidence that either he or Pastor Wiley is prevented 

from praying during the execution, or that they will not be in the presence of each 
another, or that Smith cannot see Pastor Wiley in the viewing room during the 
execution. He also has not shown that the ADOC’s policy will coerce him to violate 

15 See ADOC EXECUTION PROCEDURES 6, 7, note 7, supra; see also Doc. 27-4. 
his beliefs, to forego a fundamental religious tenet, or to render the performance of 
a religious exercise essentially impracticable. Smith does not claim, for example, 

that absent Pastor Wiley’s presence in the execution chamber, God will not hear 
Smith’s prayers of repentance, or that without Pastor Wiley holding his hand at the 
moment of death, Smith’s soul would not pass to heaven. In short, Smith has not 

demonstrated that the ADOC’s policy would amount to more than an inconvenience 
or hindrance in the exercise of his Christian faith. As a result, this court finds that 
Smith has failed to show how the ADOC’s policy will substantially burden his 
religious exercise. 

 iii. Compelling Governmental Interest 
 Even if Smith was able to demonstrate a substantial burden on his religious 
exercise, the ADOC nonetheless has a compelling interest in protecting the safety, 

security, and solemnity of the chamber, its occupants during an execution, and the 
execution process itself. 
 The death penalty is unquestionably a highly controversial topic, attracting 
proponents and opponents world-wide. And executions themselves are inherently 

emotionally charged events, which create the need for increased security and 
heightened safety precautions for everyone involved with an execution: prison 
personnel, witnesses viewing the execution, and the inmate himself. 

 Smith contends that the ADOC’s previous, long-standing practice of allowing 
the ADOC-employed institutional chaplain into the execution chamber shows that 
granting his request would have no significant impact on the ADOC’s interest in 

security. (Doc. 4, p. 15.) In response, the ADOC argues that its policy “serves the 
compelling government interest of maintaining security and solemnity during 
executions.” (Doc. 12, p. 42.) 

 Although the ADOC bears the burden of proof on the compelling interest and 
least restrictive means prongs of RLUIPA, RLUIPA’s legislative history clearly 
indicates that prison officials are entitled to due deference on issues relating to “good 
order, security and discipline, consistent with consideration of costs and limited 

resources.” S. REP. NO. S7775 (July 27, 2000); see also Cutter v. Wilkinson, 544 
U.S. 709, 716-17 (2005) (Congress “anticipated . . . that courts entertaining 
complaints under [RLUIPA] would accord ‘due deference to the experience and 

expertise of prison and jail administrators.’”) (quoting 146 Cong. Rec. 16698, 16699 
(2000) (joint statement of Sens. Hatch and Kennedy)). However, this deference is 
not absolute and “inadequately formulated prison regulations and policies grounded 
on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice 

to meet the act’s requirements.” Benning v. Georgia, 845 F. Supp. 2d 1372, 1382 
(M.D. Ga. 2012) (citing 146 Cong. Rec. S7774–01, *S7775 (July 27, 2000)). 
 The ADOC has submitted evidence in support of its compelling interest 

argument, including affidavits of ADOC employees, copies of ADOC administrative 
regulations, and excerpts of deposition testimony taken in a similar case16 currently 
being litigated in this court. (Doc. 27.) 

 In her affidavit, the ADOC’s Assistant Deputy Commissioner of Operations 
described the ADOC’s policies and security practices surrounding executions. (Doc. 
27-6.) These “heightened security measures” are implemented from the time an 

execution is announced and include the placement of the inmate on “single-walk” 
status where he is prohibited from interacting with other inmates. (Id., pp. 4-5.) 
Further, during the week leading up to an execution, the ADOC retains an outside 
security team to guard the penal facility, and local law enforcement is alerted to the 

impending execution. (Id., p. 5.) The condemned inmate is also moved to a separate 
holding cell, is observed around the clock, and his visitation is held in a separate area 
under the constant supervision of correctional officers. (Id.) On the day of the 

execution, both Holman and nearby Fountain Correctional Facility go into 
lockdown. (Id.) And the outside security team provides protection outside the 
facility while the execution team closely monitors the inmate and his final visitors 
inside the facility. (Id., pp. 5-6.) 

 The ADOC contends it is concerned not only with interference from outside 

16 Similar claims are being made by a Muslim death row inmate in the matter styled Charles L. 
Burton, Jr. v. Jefferson Dunn, et al., Case No. 2:19-cv-242-RAH (M.D. Ala. 2019). As of the date 
of this order, the parties in that matter are in the final stages of briefing their respective summary 
judgment motions. 
the prison, but also with those individuals who participate in the execution itself. In 
this regard, the ADOC’s protocol provides that only members of the trained 

execution team are allowed inside the execution chamber during the execution.17 
(See Doc. 27-6.) These individuals have not only undergone the standard ADOC 
employee background investigation process, but they have been personally selected 

by the warden based on their experience and demonstrated trustworthiness during 
their time as ADOC employees. (Id., pp. 6-7.) These individuals are trained in the 
ADOC’s execution protocol and take part in an in-person walk-through of the 
execution procedure before carrying out each execution. (Doc. 26-13, p. 3.) As a 

result of this vetting, training, and demonstrated trustworthiness, the execution team 
constitutes the only individuals permitted by the ADOC protocol to be present in the 
chamber during the execution; all other individuals are excluded, including the 

warden himself, the ADOC Commissioner, other ADOC employees, and ADOC 
legal counsel. (See generally Doc. 27.) The ADOC credits this exclusionary policy 
with its demonstrated history of secure, efficient, and dignified executions. (Doc. 
27-9, p. 9.) 

17 If a condemned inmate is being executed by lethal injection, the ADOC uses an “IV Team” 
consisting of non-ADOC medical personnel that the ADOC selects. (Doc. 27-9, pp. 12-13.) This 
team is escorted into the chamber once the inmate is strapped to the gurney and starts the inmate’s 
IV, but these individuals are not permitted to remain in the execution chamber during the execution 
itself. (Id., pp. 12-15.) The members of this team also undergo standard ADOC employee 
background checks. (Id., p. 14.) 
 The ADOC further argues that these strict security measures largely result 
from both anticipated and actual disturbances18 leading up to scheduled executions. 

The ADOC notes, for example, that during the 2010 execution of Holly Wood, his 
sisters, who were seated in the viewing room, “began to scream and violently bang 
on the glass window” of the execution chamber. (Doc. 27-6, pp. 8-9.) In 2017, 

during the execution of Torey McNabb, McNabb’s brother threatened law 
enforcement, his mother had to be reprimanded for her behavior in the viewing room, 
and McNabb used his final words to curse the ADOC. (Id., p. 9.) That same year, 
death row inmates at Holman protested a fellow inmate’s execution by staging “a 

coordinated refusal to obey orders.” (Id., p. 5.) Then, in 2019, in the moments before 
the execution of Christopher Price, Price refused to leave his cell and enter the 
execution chamber, threatening to “take out” anyone who came into his cell, thereby 

resulting in his forced extraction. (Id., pp. 6, 8.) 
 Despite these incidents involving non-ADOC employees, Smith argues that 
the ADOC’s history of allowing an ADOC-employed prison chaplain in the 
execution chamber undercuts the ADOC’s argument that the presence of a spiritual 

18 The ADOC focuses its argument on the security concerns that arise from having a free-world 
advisor of the inmate’s choosing inside the execution chamber. The ADOC has not claimed an 
interest attendant to issues associated with a medical complication from the execution itself, such 
as the one mentioned by Justice Kavanaugh in his concurrence in Murphy v. Collier, ___ U.S. ___, 
139 S. Ct. 1475 (2019) (“Things can go wrong and sometimes do go wrong in executions, as they 
can go wrong and sometimes do go wrong in medical procedures. States therefore have a strong 
interest in tightly controlling access to an execution room in order to ensure that the execution 
occurs without any complications, distractions, or disruptions.”). 
advisor implicates a compelling security interest. But the ADOC also has presented 
evidence showing that security concerns exist even with ADOC-employed chaplains 

and religious volunteers. Holman’s long-serving chaplain provided testimony that a 
previous prison chaplain was fired after smuggling contraband into the prison. (Doc. 
27-8, pp. 33.) The chaplain further testified that multiple religious volunteers have 

been reprimanded or banned from returning to the prison for breaking prison rules. 
(Id., p. 36.) Thus, the ADOC posits that even ADOC-employed or affiliated 
chaplains can pose a risk inside the prison. 
 For his part, Smith has submitted a report and testimony from Emmitt 

Sparkman, a correctional consultant with more than four decades of experience. 
After reviewing the ADOC’s protocol and practices, Sparkman opines that allowing 
an inmate’s chosen spiritual advisor to be present in the execution chamber during 

the execution creates no heightened security risk. (Doc. 26-7.) Smith also presents 
evidence indicating that two states and the Federal Bureau of Prisons (BOP) 
previously have allowed non-employee spiritual advisors in their execution 
chambers during an execution.19 (Docs. 26-5 and 26-10.) 

19 In fact, both parties have noted the federal BOP’s recent practice of allowing non-employee 
spiritual advisors inside the BOP’s execution chamber. Smith argues that this practice indicates a 
lack or nonexistence of a security concern. Neither party, however, has provided the court with 
detailed information regarding the BOP’s practice or policy, the security measures the BOP 
implements prior to approving an advisor’s presence, the timeline and procedure of selecting and 
approving an advisor, the details of what a spiritual advisor can and cannot do inside the chamber 
or where the advisor can stand, or what measures BOP has in place inside the execution chamber 
to account for the risks presented by an outside individual’s presence at the time of execution. 
 Smith’s evidence, viewed against the ADOC’s evidence, however, fails to 
convince the court that the ADOC does not have a compelling security interest in 

tightly controlling access to the execution chamber during an execution.20 Indeed, 
the ADOC has a compelling governmental interest “of the highest order” in 
preserving the solemnity, safety and security of its executions as well as a “moral 

obligation to carry out executions with the degree of seriousness and respect that the 
state-administered termination of human life demands.” Church of the Lukumi 
Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993) (quoting McDaniel v. 
Paty, 435 U.S. 618, 628 (1978)); Jackson v. Danberg, 594 F.3d 210, 230 (3d Cir. 

2010). 
 Given the evidence concerning security threats during executions—both 
experienced and anticipated—the vetting of execution team members, and the 

history of disciplinary problems with ADOC-employed chaplains and religious 
volunteers, combined with the inherently emotional nature of executions, the court 
finds that the ADOC has a compelling interest in maintaining safety, security, and 
solemnity during its executions, including what transpires during the execution and 

20 To be clear, the mere claim of a compelling interest by the ADOC does not automatically defeat 
Smith’s interests. Holt v. Hobbs, 574 U.S. 355, 363–64 (2015). The court has carefully considered 
the evidence and balanced the interests of the parties; it has not simply deferred to the ADOC. 
who is allowed inside the execution chamber.21 
 iv. Least Restrictive Means 

 RLUIPA “makes clear that it is the obligation of the courts to consider 
whether exceptions are required under the test set forth by Congress.” Gonzales v. 
O Centro Espírita Beneficente Uniõ do Vegetal, 546 U.S. 418, 434 (2006). This test 

requires the ADOC “not merely to explain why it denied the exemption but to prove 
that denying the exemption is the least restrictive means of furthering a compelling 
governmental interest.” Holt v. Hobbs, 574 U.S. 355, 364 (2015). Nothing within 
the Supreme Court or Eleventh Circuit's RLUIPA decisions appear to suggest, 

however, that prison officials must refute every conceivable option to satisfy the 
least restrictive means requirement. 
 The ADOC submits that its current protocol excluding all individuals, 

including spiritual advisors regardless of faith or employer, from the execution 
chamber is the least restrictive means of advancing its compelling interest in the 

21 The district court in Gutierrez reached the opposite conclusion. There, the district judge noted 
that the TDCJ had presented no evidence of security breaches by chaplains while in the execution 
chamber and failed to submit any evidence of disruptions caused by spiritual advisors. The 
Gutierrez court found that TDCJ’s security concerns were, therefore, too abstract and not 
sufficiently ripe. Gutierrez v. Saenz, Case No. 19-cv-185 (S.D. Tex. 2019), Doc. 124, p. 17. 
Importantly, though, Texas, like Alabama, has never allowed spiritual advisors inside the 
execution chamber. Consequently, neither defendant would conceivably be able to provide 
evidence of how free-world spiritual advisors might conduct themselves during an execution. 
Further, in the instant case, the ADOC has submitted evidence of security breaches (albeit not 
inside the execution chamber) by both religious volunteers and an ADOC-employed chaplain. This 
court is satisfied that ADOC has shown that security concerns exist if an inmate’s chosen spiritual 
advisor is allowed inside the chamber. 
safety, security, and solemnity of executions. As it concerns spiritual advisors, the 
ADOC has submitted evidence in the form of an affidavit from its long-serving 

chaplain explaining the four levels of classification for individuals authorized to 
provide pastoral or spiritual services at Holman. (See Doc. 27-7.) The first and 
highest level is the institutional chaplain, an ADOC employee subject to education, 

experience, and reference requirements, and who must go through interview 
procedures and a background investigation. (Doc. 27-7, p. 3.) Institutional chaplains 
participate in numerous training programs, both after they are initially hired and 
annually, including those on prison culture and sexual harassment, among others. 

(Doc. 27-8, pp. 9-25.) The second level is an assistant chaplain. These individuals 
are not ADOC employees, but are nonetheless subject to a full background 
investigation and required training. (Doc. 27-7, p. 3.) The third classification level 

is for volunteers, also non-ADOC employees. These individuals also must undergo 
a background investigation and complete a training program. (Id.) 
 The final level are spiritual advisors, who are likewise non-ADOC employees 
and are subject to background investigations akin to those conducted for visitors at 

the facility. (Doc. 27-6, p. 7; Doc. 27-7, pp. 3-4.) These advisors can be anyone the 
inmate chooses, even a family member, and do not have to be ordained or educated 
in any particular religion. (Doc. 27-8, p. 39.) Spiritual advisors previously 

unaffiliated with Holman are treated as visitors on the premises and do not undergo 
any training. (Doc. 27-7, p. 4.) 
 The ADOC contends that its relaxed requirements for spiritual advisors give 

death-sentenced inmates the maximum possible freedom in choosing the person they 
wish to provide comfort and guidance in the inmate’s final days and hours. The 
ADOC argues that allowing a free-world advisor not previously known to the ADOC 

inside the execution chamber would require a heightened background investigation 
to evaluate the advisor’s “character, ability to follow orders, and connection to the 
inmate . . . .” (Doc. 27-6, p. 10.) Holman’s chaplain testified that background 
investigations of ADOC employees sometimes take months to complete. (Doc. 27-

8, pp. 6-7.) Consequently, there is no guarantee that an inmate’s chosen advisor 
could undergo a more extensive background investigation in time to be present at 
the execution. Subjecting spiritual advisors to interviews, training, and heightened 

background investigation procedures, or requiring advisors to prove a certain level 
of education and experience, has the potential to restrict which individuals could be 
approved as spiritual advisors. There is also no guarantee that an inmate’s chosen 
spiritual advisor will pass a background check or vetting.22 The ADOC tries “to give 

the inmate as much latitude as possible in selecting a spiritual advisor.” (Doc. 27-6, 

22 This raises an entirely different set of issues; that is, what happens if the ADOC refuses entry of 
a particular spiritual advisor who cannot pass even a minimal background check and vetting. No 
evidence is presented by either party of whether Pastor Wiley would or would not pass a 
heightened background check and what a background check might reveal. 
p. 10.) Additional vetting, which might limit an inmate’s choice of spiritual advisor, 
would not further this end. 

 The ADOC further argues that its less-restrictive standard for spiritual 
advisors allows an inmate to make an “eleventh-hour change of religion.” (Doc. 27-
6, p. 10.) In her affidavit, the ADOC’s Assistant Deputy Commissioner of 

Operations notes that inmates are not “held to their initial declaration of faith.”23 
(Id.) Should an inmate decide to change his religious affiliation in the days or weeks 
leading up to his execution, this change would make the last-minute screening of his 
spiritual advisor unfeasible. The ADOC also notes that its inmates are affiliated at 

least “a dozen or more” faiths, making hiring and vetting chaplains of every specific 
faith financially and logistically impracticable. (Id.) 
 Based on the current record, it appears substantially unlikely that the ADOC 

could further its compelling security interest while allowing untrained, “free-world” 
spiritual advisors to be physically present inside the execution chamber. The 
ADOC’s evidence indicates that it has considered alternatives, such as heightened 
background investigation procedures, but found those alternatives to be more 

23 Because an inmate may choose to alter his religious beliefs ahead of his execution, the inmate 
may also be permitted to choose a different spiritual advisor affiliated with his newly adopted faith. 
This same policy would also allow an inmate to change his spiritual advisor if, for example, his 
spiritual advisor was to become sick or otherwise become unable to attend an execution due to 
last-minute issues. Thus, for example, if the inmate’s spiritual advisor suddenly becomes 
quarantined due to COVID-19 exposure, the inmate still would be able to designate someone else 
in his place who can view the execution from the viewing chamber. That circumstance becomes 
very different if the change-out involves someone who is permitted inside the execution chamber. 
restrictive of the inmate’s ability to freely choose his spiritual advisor. The court 
finds that the ADOC has established that there is no less-restrictive means of 

furthering its compelling governmental interests. Its interests in safety, security and 
solemnity in executions are so strong that it cannot permit even a slight chance of 
interference with an execution inside the chamber. 

 All told, the court finds—for the purposes of the preliminary injunction—that 
Smith has failed to demonstrate a substantial burden on his religious exercise, while 
the ADOC has met its burden of showing that it employs the least restrictive means 
of furthering its compelling safety, security and solemnity interest. As a result, Smith 

is unlikely to succeed on the merits of his RLUIPA claim. 
B. First Amendment Claims 
 In addition to his RLUIPA claim, Smith asserts that the ADOC’s policy and 

actions violate both the Establishment Clause and the Free Exercise Clause of the 
First Amendment. Because RLUIPA “provide[s] greater protection for religious 
exercise than is available under the First Amendment,” see Holt, 135 S. Ct. at 859-
60, if a prison's regulation passes muster under RLUIPA, it will necessarily satisfy 

the requirements of the First Amendment. Allen, 502 F.3d 1281 n. 5 (citing Charles 
v. Frank, 101 F. App’x 634, 635 (7th Cir. 2004) (per curiam)). Nonetheless, the 
court will address Smith’s First Amendment claims in turn. 
 1. Establishment Clause 
 The question Smith presents is whether the ADOC’s amended policy which 

prohibits all inmates from having anyone, including a spiritual advisor of his 
choosing, inside the execution chamber with him at the moment of execution is 
violative of the Establishment Clause. (Doc. 1, pp. 16-18.) In his Emergency 

Motion for Preliminary Injunction, Smith contends he has a substantial likelihood of 
prevailing on the merits of this claim because the “ADOC’s policy erects a barrier 
between prisoners and the exercise of their religious beliefs.” (Doc. 4, p. 19.) The 
ADOC asserts the Establishment Clause claim should be dismissed pursuant to Rule 

12(b)(6) because Smith has failed to state a claim upon which relief can be granted. 
(Doc. 12, p. 32.) 
 The Establishment Clause of the First Amendment provides, “Congress shall 

make no law respecting an establishment of religion.” U.S. Const. amend. I. “This 
restriction has been made applicable to states, as well as state-created entities and 
their employees, through the Due Process Clause of the Fourteenth Amendment.” 
Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1284 (11th Cir. 2004) (citing 

Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)). “The Establishment Clause 
applies not only to state statutes but acts and decisions of individual governmental 
actors” as well. Id. (citing Lee v. Weisman, 505 U.S. 577, 587 (1992)). 

 The Establishment Clause prohibits governmental entities from preferring one 
religion over another religion, but also prevents the creation of laws that demonstrate 
hostility toward religion. See American Legion v. American Humanist Assoc., ___ 

U.S. ___, 139 S. Ct. 2067, 2074 (2019); Van Orden v. Perry, 545 U.S. 677, 683-84 
(2005); Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 845-46 
(1995); Larson v. Valente, 456 U.S. 228, 246 (1982). 

 The parties agree that the constitutional standard set forth in Lemon v. 
Kurtzman, 403 U.S. 602 (1971), applies to Smith’s Establishment Clause claim. 
(Doc. 12, p. 33.) To survive an Establishment Clause challenge under the Lemon 
test, (1) the government activity in question must have a secular purpose, (2) its 

principal or primary effect must be one that neither advances nor inhibits religion, 
and (3) it must not foster an excessive entanglement with religion. Lemon, 403 U.S. 
at 612-13.24 

 The ADOC argues the absence of any and all persons, including spiritual 
advisors, meets all three prongs of the Lemon test because (1) the amended policy 
excluding all outside individuals, including spiritual advisors, family members, 
friends, and other ADOC employees, from the execution chamber furthers the policy 

of “maintaining security in the chamber and the solemnity of the event”; (2) the 

24 This court recognizes the Lemon test is not applicable to certain Establishment Clause 
challenges. See American Legion v. American Humanist Assoc., U.S. , 139 S. Ct. at 2086-
2089 (a plurality rejected the Lemon test in claims involving religiously expressive monuments, 
symbols, and displays); Lamb's Chapel v. Center Moriches Sch. Dist., 508 U.S. 384, 395 n. 7 
(1993) (noting that despite heavy criticism of the Lemon test, it has not been overruled). 
primary effect is to maintain the safety, security and solemnity of the execution and, 
therefore, the amended policy does not advance or inhibit religion; and (3) the policy 

disentangles the government from religion by removing all clergy and spiritual 
advisors from the chamber. (Doc. 12, p. 33.) 
 Smith does not dispute that the ADOC’s amended policy generally meets the 

first and third prongs of the Lemon test. Instead, he argues that the policy does not 
satisfy the second prong. Smith attests that the primary effect of the ADOC’s 
prohibition of an inmate’s chosen spiritual advisor in the execution chamber will 
inhibit the practice of his religious beliefs. (Doc. 13-1, p. 18.) The ADOC maintains 

that the primary effect of the amended policy is to further the safety, security and 
solemnity of the execution. (Doc. 12, p. 33.) The effects prong of the Lemon test 
“asks whether, irrespective of [the] government's actual purpose, the practice under 

review in fact conveys a message of endorsement or disapproval” of religion. 
Wallace v. Jaffree, 472 U.S. 38, 56 n. 42 (1985) (quoting Lynch, 465 U.S. at 690 
(O'Connor, J., concurring)). 
 There is no dispute that the ADOC removed its institutional chaplain from the 

execution chamber in response to recent litigation concerning the presence of its 
chaplain during executions. (See Doc. 12, p. 12.) In Ray v. Commissioner, Alabama 
Department of Corrections, 915 F.3d 689 (11th Cir. 2019), Muslim inmate 

Domineque Ray requested the presence of his imam inside the chamber to provide 
spiritual guidance at the time of his death. He also objected to the presence of the 
ADOC-employed Christian chaplain in the execution chamber. The ADOC agreed 

to remove the chaplain but refused to grant the request for the presence of Ray’s 
imam. On February 6, 2019, the Eleventh Circuit determined that Ray’s challenge 
to the ADOC policy of allowing the presence of the ADOC chaplain in the execution 

chamber while refusing to allow his free-world imam in the chamber demonstrated 
a “powerful Establishment clause claim.” 915 F.3d at 695. Strongly criticizing the 
State of Alabama for its actions, the Eleventh Circuit held that the ADOC’s policy 
(at that time) “facially further[ed] a denominational preference” Id. at 697. 

 After concluding that “Alabama appears to have set up ‘precisely the sort of 
denominational preference that the Framers of the First Amendment forbade,’” the 
Court found Ray had demonstrated a substantial likelihood of success on the merits 

of his Establishment claim and granted an emergency motion for a stay. Id. at 697-
98 (quoting Larson, 456 U.S. at 255). Due to the last-minute nature of the 
application, however, the Supreme Court vacated the Eleventh Circuit’s imposition 
of the stay. Dunn v. Ray, ___ U.S. ___, 139 S. Ct. 661 (2019). Ray ultimately was 

executed with no spiritual advisor of any sort inside the execution chamber. 
 The following month, the Supreme Court granted a stay to Texas inmate 
Patrick Murphy, a Buddhist who had requested that his chosen spiritual advisor or a 
comparable Buddhist advisor be present with him in the execution chamber.25 
Murphy v. Collier, ___ U.S. ___, 139 S. Ct. 1475 (2019) (Kavanaugh, J., 

concurring). Murphy challenged Texas’ policy that allowed either the prison’s 
Christian or Muslim state-employed chaplain to be present but excluded all other 
spiritual advisors. In his concurrence, Justice Kavanaugh stated: 

 In an equal-treatment case of this kind, the government 
 ordinarily has its choice of remedy, so long as the remedy 
 ensures equal treatment going forward. See Stanton v. Stanton, 
 421 U.S. 7, 17–18 (1975). For this kind of claim, there would be 
 at least two possible equal-treatment remedies available to the 
 State going forward: (1) allow all inmates to have a religious 
 adviser of their religion in the execution room; or (2) allow 
 inmates to have a religious adviser, including any state- 
 employed chaplain, only in the viewing room, not the execution 
 room. A State may choose a remedy in which it would allow 
 religious advisers only into the viewing room and not the 
 execution room because there are operational and security issues 
 associated with an execution by lethal injection. Things can go 
 wrong and sometimes do go wrong in executions, as they can go 
 wrong and sometimes do go wrong in medical procedures. 
 States therefore have a strong interest in tightly controlling 
 access to an execution room in order to ensure that the execution 
 occurs without any complications, distractions, or disruptions. 
 The solution to that concern would be to allow religious advisers 
 only into the viewing room. 

 In any event, the choice of remedy going forward is up to the 
 State. What the State may not do, in my view, is allow Christian 
 or Muslim inmates but not Buddhist inmates to have a religious 
 adviser of their religion in the execution room. 

25 Murphy filed his request for a religious accommodation with the TDCJ one month in advance 
of his execution. Murphy, 139 S. Ct. at 1477. 
Murphy v. Collier, 139 S. Ct. at 1475-1476 (Kavanaugh, J., concurring in grant of 
application for stay on March 28, 2019). 

 On April 2, 2019, five days after the Supreme Court granted a stay in Murphy, 
Texas changed its policy to exclude all spiritual advisors, including those employed 
by the state of Texas, from the chamber; they could, however, view the execution 

from the viewing room. Id. at 1476. On May 13, 2019, in a statement concerning 
Justice Alito’s dissent, Justice Kavanaugh suggested that “[t]he new policy solves 
the equal-treatment constitutional issue” and suggested that “the prompt resolution 
of a significant religious equality problem with the State’s execution protocol . . . 

should alleviate any future litigation delays or disruptions that otherwise might have 
occurred as a result of the State’s prior discriminatory policy.” Id. (Kavanaugh, J., 
statement, joined by Roberts, C.J.). 

 In April 2019, relying on Justice Kavanaugh’s concurrence in Murphy, the 
ADOC likewise amended its execution protocol to remove the required presence of 
its institutional chaplain inside the execution chamber. (Doc. 12, p. 12.) Now, no 
spiritual advisors, regardless of faith, employer, or security risk, are allowed inside 

the chamber. Smith argues that the ADOC’s attempt to cure one constitutional 
infirmity “created a new one: it has the primary effect of inhibiting religious 
practice.” (Doc. 4, p. 19.) Specifically, he argues the ADOC’s amended policy erects 
a barrier between prisoners and the exercise of their religious beliefs, including 
Smith’s own. (Id.) 

 The ADOC maintains that the amended policy meets the second prong of the 
Lemon test because the primary effect of the policy is to further the safety, security 
and solemnity of an execution. (Doc. 12, p. 33.) The prohibition of spiritual advisors 

inside the execution chamber neither advances nor inhibits any particular religion 
because, as alleged in the Complaint, a condemned inmate is allowed to visit with 
his spiritual advisor of choice just before entering the execution chamber and is free 
to pray in the moments before his death. The amended policy allows no one in the 

execution chamber at the moment of execution, including family members, friends 
and other ADOC employees. Everyone is excluded, except for those who serve on 
the execution team. 

 The facts presented in this case demonstrate that the ADOC’s amended policy 
does not have the primary effect of inhibiting religion. A condemned inmate is 
permitted to visit and pray with his spiritual advisor before he enters the execution 
chamber. The advisor is also allowed to watch the execution from the viewing room 

and pray for the inmate during the execution, only a few feet away and separated 
only by security glass. Although an inmate and his spiritual advisor are unable to 
touch or hold hands, they can see each other just as the inmate can do with any friend 

or family member who also attends. Thus, it is clear the primary effect of the 
amended policy neither advances nor inhibits religion. See Bown v. Gwinnett Cty. 
Sch. Dist., 112 F.3d 1464, 1472 (11th Cir. 1997) (determining that statute requiring 

moment of silence in school did not have the primary effect of advancing or 
inhibiting religion). 
 On the face of the Complaint, Smith has failed to allege facts demonstrating 

the ADOC’s amended policy prohibiting spiritual advisors in the execution chamber 
itself is hostile to religion. Instead, if the amended policy does anything, it removes 
an unconstitutional exception to an otherwise religion-neutral policy of general 
exclusion. Consequently, the ADOC’s motion to dismiss pursuant to Rule 12(b)(6), 

is due to be GRANTED as to the Establishment Clause claim. Moreover, even 
assuming Smith pled sufficient facts, this court concludes that Smith is unlikely to 
prevail on the merits of his Establishment Clause claim. 

 2. Free Exercise Clause 
 Smith asserts the ADOC’s amended policy is also violative of the Free 
Exercise Clause. Specifically, Smith states the amended policy constitutes a policy 
that is hostile toward religion. (Doc. 1, p. 19.) The ADOC argues that this court 

should dismiss the free exercise claim pursuant to Rule 12(b)(6) because Smith has 
failed to state a claim upon which relief can be granted. (Doc. 12, p. 32.) 
 “First Amendment Free Exercise Clause precedent is clear: a plaintiff must 

allege a constitutionally impermissible burden on a sincerely held religious belief to 
survive a motion to dismiss.” GeorgiaCarry.Org., Inc. v. Ga., 687 F.3d 1244, 1256 
(11th Cir. 2012). “This is so because, as a threshold issue—before a court even 

considers whether a law is subject to the rational basis test or, alternatively, strict 
scrutiny—a court must be able to determine that the protection of the Free Exercise 
Clause is triggered.” Id. “To plead a valid free exercise claim, [a plaintiff] must 

allege that the government has impermissibly burdened one of his ‘sincerely held 
religious beliefs.’” Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1294 (11th Cir. 2007) 
(citation omitted). A plaintiff must allege “‘enough factual matter (taken as true) to 
suggest’ that his religious belief [is] sincerely held . . . ‘plausible grounds to infer’ 

that it [is] sincerely held . . . and ‘identify[ ] facts that are suggestive enough to render 
[the sincerity of his belief] plausible [ ]’ . . . . That is all that is required at this stage 
of the litigation.” Id. at 1296 (alteration in original) (citations omitted). Smith has 

sufficiently pled his claim that the amended ADOC policy precludes his sincere 
desire to have a spiritual advisor present inside the chamber during his execution. 
Thus, the ADOC’s motion to dismiss the free exercise claim pursuant to Rule 
12(b)(6) is due to be DENIED. 

 Because the ADOC also argues the Emergency Motion for Preliminary 
Injunction is due to be denied, the court must now determine the likelihood of Smith 
prevailing on the merits of his Free Exercise Clause claim. 

 While prisoners retain First Amendment rights, including the First 
Amendment right of free exercise of religion, see Cruz v. Beto, 405 U.S. 319, 322 
(1972) (per curiam), prison regulations or policies “alleged to infringe constitutional 

rights are judged under a ‘reasonableness’ test less restrictive than that ordinarily 
applied to alleged infringements of fundamental constitutional rights.” O'Lone v. 
Estate of Shabazz, 482 U.S. 342, 349 (1987) (holding that the Turner v. Safley 

standard of review is applicable to claims that an inmate's free exercise rights have 
been violated). Courts must give respect and deference to the judgment of prison 
administrators in considering First Amendment challenges raised within the confines 
of prisons or jails. O'Lone, 482 U.S. at 350. 

 The Turner standard of review requires the court to uphold prison regulations 
if they are “reasonably related to legitimate penological interests.” O'Lone, 482 U.S. 
at 350 (determining that Turner v. Safley’s “reasonableness” test is appropriate to 

claims of “alleged infringements of fundamental constitutional rights.”). Thus, “[a] 
prison regulation, even though it infringes the inmate's constitutional rights, is an 
actionable constitutional violation only if the regulation is unreasonable.” Hakim v. 
Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000), cert. denied, 532 U.S. 932 (2001) 

(holding that policy which precluded use of a “dual-name” on inmate identification 
card violated inmate's right to the free exercise of religion by denying him his 
Muslim identity and was unreasonable under Turner). 

 The Turner standard employs four factors to determine the reasonableness of 
a challenged prison regulation, rule, or policy. “First, there must be a ‘valid, rational 
connection’ between the prison regulation and the legitimate governmental interest 

put forward to justify it.” Turner, 482 U.S. at 89 (citing Block v. Rutherford, 468 
U.S. 576, 586 (1984)). The remaining three factors consider: “(2) whether there are 
alternative means of exercising the asserted constitutional right that remain open to 

the inmates; (3) whether and the extent to which accommodation of the asserted right 
will have an impact on prison staff, inmates, and the allocation of prison resources 
generally; and (4) whether the regulation represents an exaggerated response to 
prison concerns.” Hicks, 223 F.3d at 1247-48 (quoted in Johnson v. Brown, 581 Fed. 

Appx. 777, 780 (11th Cir. 2014)). 
 a. The Rational Connection to Security 
 The ADOC maintains there is a rational connection between the policy 

prohibiting non-employees, such as free-world spiritual advisors chosen by the 
inmate, from the execution chamber and the ADOC’s need to provide a safe, secure, 
solemn, and respectful execution. (Doc. 12, pp. 39-40.) Smith argues, however, that 
the policy evinces a hostility toward religion and is therefore not neutral. (Doc. 13-

1, p. 23.) 
 If the “asserted goal is so remote” from the policy such that it appears 
“arbitrary or irrational” or if the “governmental objective” is not a “legitimate and 

neutral one,” the regulation or policy “cannot be sustained” as constitutional. Turner, 
482 U.S. at 89-90. Security is a compelling governmental objective. Cutter v. 
Wilkinson, 544 U.S. 709, 725 n. 13 (2005). The court also finds that maintaining 

solemnity of the execution proceeding is a compelling interest. 
 As previously discussed, the ADOC has presented sufficient evidence 
demonstrating the heightened security risks that exist during an execution and the 

rational reasons for allowing only necessary medical personnel and members of the 
execution team inside the chamber. The ADOC has submitted evidence of outbursts 
from free-world visitors and at least one condemned inmate during an execution, as 
well as evidence of inmates making threats and staging protests in response to 

executions. And these are just documented disturbances that have occurred during 
executions over the previous ten years. Common sense dictates that there are a 
multitude of other things that could go wrong from a safety and security standpoint, 

especially in an effort to stop an execution. Distractions of this sort are disruptive 
and pose a substantial security risk to personnel performing the execution and 
undermine efforts to conduct an execution that is serious, dignified, and respectful, 
thereby preserving the solemnity of the proceeding. As a result, the court finds that 

ADOC has provided a logical foundation for its amended policy banning all persons 
of the inmate’s choosing, including spiritual advisors, from the execution chamber. 
Consequently, the first factor weighs in the ADOC’s favor as security problems 

could conceivably arise when a free-world spiritual advisor of the inmate’s choosing 
is present during the execution process. 
 b. Alternative Means 

 The ADOC asserts that Smith has alternative means of exercising his religious 
freedom because Smith is allowed religious reading materials, visits with his chosen 
spiritual advisor, and may otherwise practice his faith during the week leading up to 

his execution. Smith may also have an in-person contact visit with his spiritual 
advisor prior to entering the execution chamber where the two men may pray, study 
scripture, hold hands, and otherwise comfort each other. Smith and his pastor are 
also able to see each other through the viewing room window during Smith’s 

execution, and both Smith and his spiritual advisor may pray throughout the 
execution process. Because Smith has alternative means of practicing his faith, the 
court finds that this factor weighs heavily in favor of the ADOC. 

 c. Accommodation of the Requested Right 
 The ADOC also asserts that accommodating Smith’s request would create an 
unnecessary safety and security risk during the execution. The ADOC argues that 
free-world spiritual advisors of an inmate’s choosing are neither investigated nor 

trained to the same degree as ADOC employees, nor are they vetted in the way 
members of the execution team are vetted. The ADOC maintains it cannot exercise 
the same control over free-world spiritual advisors as it can with its own chosen 

employees. The ADOC further argues that, even if a spiritual advisor were to sign a 
form agreeing to follow orders during an execution, there is no guarantee that a 
disturbance would not occur. (Doc. 12, p. 40.) The court recognizes that Smith’s 

pastor has visited the prison on several occasions without incident. A routine visit, 
however, is different from allowing someone into the execution chamber while an 
inmate is being put to death. An execution involves heightened security during a 

highly emotional event and Smith’s spiritual advisor is not beholden to the ADOC 
in any form. Therefore, although the court affords some weight to Smith as to this 
factor, the balance ultimately weighs more heavily in favor of the ADOC. 
 d. Ready Alternatives 

 As to the final factor, the ADOC argues there are no ready alternatives to 
Smith’s request for his spiritual advisor because the amended policy does not permit 
anyone inside the execution chamber except for members of the execution team. 

The ADOC notes that its policy is a reasonable regulation in the interest of safety, 
security, solemnity, and fairness to inmates of all faiths or no faith at all. The court 
agrees. 
 After weighing these four factors and recognizing that the ADOC’s policy 

infringes on Smith's exercise of religion to some degree, the court concludes that 
Smith is unlikely to demonstrate that the ADOC’s amended policy is 
“unreasonable.” The ADOC has a legitimate governmental interest in tightly 

controlling access to its execution chamber during an execution, and the challenged 
policy has a rational connection to that interest. Smith's rights are necessarily limited 
by virtue of his incarceration, but he has not shown that he is unable to generally 

exercise his religious faith. This court therefore concludes that Smith is unlikely to 
prevail on the merits of his Free Exercise claim. 
C. The ARFA Claim 

 Smith also asserts the ADOC’s policy violates the Alabama Religious 
Freedom Amendment (“ARFA”), Ala. Const. Art. I, § 3.01(V). Specifically, he 
maintains that excluding his spiritual advisor from the execution chamber is a burden 
on his religion and is not the least restrictive means of furthering a compelling 

governmental interest. (Doc. 1, pp. 15-16.) He also asserts that, because “[t]he 
ARFA analysis is essentially the same as that under RLUIPA – except a plaintiff is 
required to show only any burden on religion, rather than a ‘substantial burden,’” he 

is substantially likely to prevail on his ARFA claim as well. (Doc. 4, pp. 17-18 
(emphasis added).) 
 The ADOC asks this court to decline to exercise supplemental jurisdiction as 
to the ARFA claim. Alternatively, the ADOC contends this court should dismiss 

Smith’s ARFA claim pursuant to Rule 12(b)(6) and that the motion for a preliminary 
injunction is due to be denied as well. 
 For a federal court “[t]o exercise [supplemental] jurisdiction over state law 

claims not otherwise cognizable in federal court, ‘the court must have jurisdiction 
over a substantial federal claim and the federal and state claims must derive from a 
‘common nucleus of operative fact.’’” L.A. Draper & Son v. Wheelabrator Frye, 

Inc., 735 F.2d 414, 427 (11th Cir. 1984) (citation omitted). The exercise of 
supplemental jurisdiction is discretionary. United Mine Workers of Am. v. Gibbs, 
383 U.S. 715, 726 (1966). 

 Citing Thai Meditation Association of Alabama, Inc. v. City of Mobile, 980 
F.3d 821 (11th Cir. 2020), the ADOC contends the exercise of supplemental 
jurisdiction is not appropriate because the Eleventh Circuit recently observed that 
there is limited Alabama case law interpreting ARFA and noting that its own 

interpretation of ARFA was its “best Erie guess.” 980 F.3d at 837, 840. Although 
this court recognizes there are few Alabama court decisions interpreting or applying 
ARFA, it cannot ignore the Eleventh Circuit’s holding and sound interpretation of 

the language of ARFA. Therefore, this court will exercise supplemental jurisdiction. 
 ARFA was ratified in 1998 and is codified at § 3.01 of the Alabama 
Constitution. ARFA's operative provision provides: 
 (a) Government shall not burden a person's freedom of religion 
 even if the burden results from a rule of general applicability, 
 except as provided in subsection (b). 

 (b) Government may burden a person's freedom of religion only 
 if it demonstrates that application of the burden to the person: 

 (1) is in furtherance of a compelling governmental interest; 
 and 
 (2) is the least restrictive means of furthering that 
 compelling interest. 

Ala. Const. Art. I, § 3.01(V). 
 Because the language of this state constitutional provision essentially tracks 
that of RLUIPA, the court, at least in part, will interpret and apply this provision in 
light of case law decided under RLUIPA. See Presley v. Scott, No. 4:13-cv-02067, 
2014 WL 7146837, at *24 (N.D. Ala. Dec. 15, 2014). 

 The same claims and issues raised in Smith’s federal RLUIPA claim appear 
with respect to this state-law claim. Construing the facts in the Complaint in favor 
of Smith, and assuming the truthfulness of Smith’s statements that he is a practicing 
Christian and that his request for his spiritual advisor to be with him in the execution 

chamber is an important aspect of his faith, Smith has established a prima facie 
ARFA violation. Smith has sufficiently alleged both that he wishes to engage in a 
religious exercise and that the ADOC’s policy of disallowing all individuals, 

including spiritual advisors, from inside the execution chamber burdens his religion 
by preventing him from praying with and receiving comfort from his pastor in his 
final moments of life. Because Smith’s allegations plead a claim that is plausible on 
its face, the ADOC’s motion to dismiss is due to be DENIED as to Smith’s ARFA 

claim. The court now turns to Smith’s request for preliminary injunctive relief. 

 1. The Burden on Religious Exercise 
 ARFA's purpose “is to guarantee that the freedom of religion is not burdened 
by state and local law; and to provide a claim or defense to persons whose religious 

freedom is burdened by government.” Ala. Const., § 3.01, § III. Smith alleges that 
the ADOC’s refusal to allow his spiritual advisor in the execution chamber does just 
that. 

 In Thai Meditation Association of Alabama, Inc., the Eleventh Circuit 
considered whether “the Alabama Constitution [is] markedly more protective of 
religious exercise than federal law in that it requires a plaintiff to show, as 
prerequisite to the application of strict scrutiny, only that government action 

'burdened' – rather than 'substantially burdened' – his religious exercise[.]” 980 F.3d 
at 837. The court determined that the use of the term “burden” in place of the more 
familiar “substantial burden” language found within RLUIPA was intentional. 980 

F.3d at 839-40. Consequently, the court held “what ARFA says is that any burden—
even an incidental or insubstantial one—suffices to trigger strict scrutiny.” Id. at 840. 
 As previously discussed, Smith believes his spiritual advisor’s presence will 
provide spiritual comfort during his execution and ease his transition from life to 

death. The ADOC’s policy forbids the spiritual advisor from entering the execution 
chamber. Thus, under the low threshold burden applicable under ARFA, the court 
finds the ADOC policy burdens Smith’s religion by preventing him from engaging 

in an exercise important to his faith. 
 2. The Traditional Strict-Scrutiny Standard 
 The ADOC may only burden Smith’s freedom of religion, however, if it 

satisfies the traditional strict scrutiny standard. See Thai Meditation Association of 
Alabama, Inc., 980 F.3d at 839 (citing Ala. Const. Art. I, § 3.01(V)(a)-(b)). To 
satisfy strict scrutiny, government action must advance a compelling interest and “be 

narrowly tailored in pursuit of that interest.” See Espinoza v. Montana Department 
of Revenue, 140 S. Ct. 2246, 2260 (2020). 
 As previously determined in this court’s analysis of Smith’s federal RLUIPA 
claim, the ADOC has a compelling interest in maintaining safety, security, and 

solemnity during an execution, particularly in light of evidence concerning security 
threats during executions, the vetting of execution team members, and the history of 
disciplinary problems with ADOC-employed chaplains and religious volunteers. 

The ADOC has also met its burden of showing that its policy is narrowly tailored in 
pursuit of furthering its compelling security interest. As a result, the court finds that 
Smith is unlikely to succeed on the merits of his ARFA claim. 
D. Remaining Preliminary Injunction Factors 

 In addition to evaluating Smith’s likelihood of success on the merits of his 
statutory and constitutional claims, the court must also determine whether 
irreparable injury will be suffered unless the injunction issues, whether the 

threatened injury to the movant outweighs whatever damage the proposed injunction 
may cause the opposing party, and if issued, whether the injunction would not be 
adverse to the public interest. See McDonald's Corp., 147 F.3d at 1306 (citing All 

Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537 
(11th Cir. 1989)). 
 Smith argues that he will suffer irreparable injury if an injunction is not 

granted; specifically, the loss of his First Amendment freedoms. (Doc. 3, p. 21.) 
Smith alleges that depriving him of the benefit of sharing his final moments with his 
chosen spiritual advisor will “result in the execution of a human being in an 
unconstitutional manner.” (Id.) Further, Smith argues that any harm to the ADOC 

“amounts to the minor inconvenience of the delayed execution of a prisoner who has 
been on death row for more than two decades . . . .” (Id., p. 22.) Finally, Smith 
contends that the general public interest is served by granting relief in this case. He 

argues that neither the ADOC nor the public has an interest in conducting executions 
in a manner that violates the constitution. (Id., pp. 22-23.) 
 For its part, the ADOC argues that Smith has failed to establish his burden on 
the remaining preliminary injunction factors. Particularly, the ADOC notes that 

Smith will not suffer irreparable harm in the absence of an injunction because Smith 
is not being prevented from practicing his faith. (Doc. 12, p. 39.) The ADOC again 
points to its protocol that allows Smith to visit with his chosen advisor in the days, 

hours, and minutes leading up to his execution, during which time Smith can receive 
comfort and spiritual guidance. (Id.) The ADOC also notes Smith’s delay in 
requesting relief. (Id., pp. 42-44.) 

 After considering the evidence submitted by both parties, the court finds that 
a preliminary injunction should not issue in this case. The court already has 
concluded that Smith is unlikely to succeed on the merits of his RLUIPA, First 

Amendment, and ARFA claims, and Smith has, in fact, been unsuccessful on the 
merits of his Establishment Clause claim as that claim has been dismissed. The court 
agrees with Smith that carrying out executions in an unconstitutional manner would 
result in irreparable injury and fails to serve the public interest. But that is not the 

case here. 
 As the court already has noted, Smith is not being deprived of the opportunity 
to practice his Christian faith. The ADOC’s policy of requiring his spiritual advisor 

to view Smith’s execution from an adjacent room, mere feet away and separated 
only by a glass barrier, does not substantially burden Smith’s religious exercise. 
Because he is not being coerced to violate his religious beliefs, he will not suffer 
irreparable injury, and the public’s interests will not be harmed. Instead, the court 

finds that the state of Alabama’s strong interest in enforcing its criminal judgments 
and the public interest in seeing capital sentences completed both weigh heavily in 
favor of denying a preliminary injunction in this case. See In re Blodgett, 502 U.S. 

236, 239 (1992) (per curiam). 
 What’s more—as Smith has himself noted—Smith has been on death row for 
two decades and was on death row when the ADOC amended its execution protocol 

almost two years ago. In fact, Smith is represented by the same legal counsel who 
filed an identical lawsuit on behalf of another death-sentenced inmate on April 4, 
2019.26 Smith could have requested relief much earlier than weeks prior to his 

execution. He could have brought this action in April 2019 immediately after the 
change in protocol. Or contemporaneously with the claims in his initial § 1983 suit 
filed before another judge in this District. Although not fatal, “a delay in seeking a 
preliminary injunction of even only a few months . . . militates against a finding of 

irreparable harm.” See Wreal, 840 F.3d at 1248. 
 Because Smith is unlikely to succeed on the merits of any of his four claims, 
and because he has failed to carry the burden of persuasion on the remaining factors, 

the court finds that the “extraordinary and drastic remedy” of a preliminary 
injunction is not warranted here. McDonald’s Corp., 147 F.3d at 1306. Smith’s 
motion is due to be DENIED. 
 V. CONCLUSION 

 Based upon the foregoing, it is ORDERED as follows: 
 1. The ADOC’s Motion to Dismiss (Doc. 12) is GRANTED as to Smith’s 
 Establishment Clause claim; 

26 See Burton v. Dunn, Case No. 19-cv-242-RAH (M.D. Ala.) 
2. The ADOC’s Motion to Dismiss (Doc. 12) is DENIED as to Smith’s 
 RLUIPA, Free Exercise, and ARFA claims; 

3. Smith’s Emergency Motion for Preliminary Injunction (Doc. 3) is DENIED; 
 and 
4. All claims related to the Sunday services issue are DISMISSED as moot. 

 DONE and ORDERED this the 2nd day of February, 2021. 

 /s/ R. Austin Huffaker, Jr. 
 R. AUSTIN HUFFAKER, JR. 
 UNITED STATES DISTRICT JUDGE